[Cite as *Clark v. Grant Med. Ctr.*, 2015-Ohio-4958.]

## IN THE COURT OF APPEALS OF OHIO

## TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Catherine Clark et al., | : | |
| Plaintiffs-Appellees, | : | No. 14AP-833 |
| | | (C.P.C. No. 11CV-12941) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| Grant Medical Center et al., | : | |
| Defendants-Appellants. | : | |

## D E C I S I O N

### Rendered on December 1, 2015

*Colley Shroyer & Abraham Co., LPA,* and *David I. Shroyer*, for appellees.

*Hanna, Campbell & Powell, LLP,* and *Douglas G. Leak*; *Roetzel & Andress, LPA*, and *Thomas A. Dillon,* for appellants.

APPEAL from the Franklin County Court of Common Pleas

LUPER SCHUSTER, J.

{¶ 1} Defendants-appellants, Grant Anesthesia Services, LTD and John G. Blair, M.D., appeal from a judgment entry of the Franklin County Court of Common Pleas entering judgment, pursuant to jury verdict, in favor of plaintiffs-appellees, Catherine Clark and Danny Clark (collectively "the Clarks"). Appellants additionally appeal from a decision and entry of the trial court granting the Clarks' renewed motion for prejudgment interest. For the following reasons, we affirm.

## I. Facts and Procedural History

{¶ 2} On October 17, 2011, the Clarks filed a complaint against appellants asserting claims for medical malpractice, negligence, and loss of consortium. The

allegations in the complaint related to the anesthesiology care and treatment Catherine received in connection with her planned hip replacement surgery.

{¶ 3} At a jury trial commencing January 6, 2014, the evidence indicated Catherine, who was 62 years old by the time of trial and suffered from rheumatoid arthritis, intended to undergo hip replacement surgery on October 29, 2010. Her anesthesiology care was provided by Dr. Blair and a certified registered nurse anesthetist ("CRNA") working under his supervision, Nicholas Tierney. Tierney made the first attempt to intubate Catherine in order to administer anesthesia but was unsuccessful. Dr. Blair then made several attempts of his own using a laryngoscope but was not able to successfully intubate Catherine either. After asking for the assistance of one of his partners, George Raymond Connell, M.D., who was also unable to intubate Catherine, Dr. Blair ceased the intubation attempts and woke Catherine from the sedative medication. Catherine left the operating room on October 29, 2010 without having undergone the hip replacement surgery. Two days later, after experiencing extreme pain in her throat and having difficulty swallowing, Catherine underwent a CAT scan that revealed a perforation of the right pyriform sinus, which is very near the entrance to the esophagus. Catherine required emergency surgery to repair the perforation. Dr. Blair agreed that the perforation occurred during one of his unsuccessful attempts to intubate Catherine using a laryngoscope.

{¶ 4} Dr. Connell testified via deposition in his capacity both as a physician who participated in Catherine's care and as an expert witness. Dr. Connell said that on the day of Catherine's planned hip replacement surgery, he was supervising a CRNA in another operating room when someone came into the room and said they needed help in Catherine's operating room. When Dr. Connell went into Catherine's operating room, he saw Dr. Blair and Tierney attempting to mask ventilate Catherine. Dr. Connell took over holding the mask with two hands, and with his adjustments and the help of someone else squeezing the bag, he was able to ventilate the patient. However, Dr. Connell was concerned that the mask ventilation was "not adequate," and he was worried about the patient's ability to get oxygen. (Jan. 7, 2014 Tr. Vol. I, 100.) By the time Dr. Connell entered the operating room, Dr. Blair had already tried other methods of ventilating the patient but was unsuccessful. Dr. Connell explained that Catherine had received general

anesthetic induction, which consists of several medications to depress her ventilation and make her unable to "ventilate spontaneously." (Jan. 7, 2014 Tr. Vol. I, 100.) Once a patient has received these drugs, her medical team must ventilate the patient, meaning open an airway for her, because she would no longer be able to breathe on her own.

{¶ 5} Dr. Connell testified that he uses an intubating device called a video GlideScope, which is "a fiber-optic light with a camera and a screen," allowing the anesthesiologist to look at the screen to "see what the blade sees." (Jan. 7, 2014 Tr. Vol. I, 103.) Dr. Connell described the video GlideScope as "an adjunct in patients that may have a difficult airway." (Jan. 7, 2014 Tr. Vol. I, 103.) The blade on the GlideScope, as Dr. Connell explained, is a curved blade that moves the tongue out of the line of sight of the airway, and if a patient has a longer neck or deeper thyromental distance, the distance from the tip of the chin to the larynx, the anesthesiologist might need a longer blade in order to lift the epiglottis and get visualization of the airway. After ventilating Catherine with the mask, Dr. Connell said he asked Dr. Blair whether he had used the smaller blade on the video GlideScope to try to visualize Catherine's airway, and Dr. Blair said he had not. Dr. Connell then looked for the airway with the smaller blade, and all he could see was soft tissue and some edema but "[n]othing identifiable as far as an airway structure that [he] could have attempted to place a tube." (Jan. 7, 2014 Tr. Vol. I, 104.) At that point, Dr. Connell said he told Dr. Blair that they needed to wake Catherine. Dr. Blair agreed, so they reversed the muscle relaxant, helped hold her airway, and woke her.

{¶ 6} Dr. Connell then explained the view of the airway that a physician or CRNA looks for when attempting to intubate. A grade I view, which is "really easy and ideal," is when, doing a direct laryngoscopy, the person attempting to intubate can see the epiglottis and the vocal cords. (Jan. 7, 2014 Tr. Vol. I, 108.) Grade II is more difficult but still provides enough of a view of the airway to get the tube in. Grade III sometimes requires the assistance of a stylet to guide the tube to the target, but, "with experience," still allows a physician to intubate the patient directly. (Jan. 7, 2014 Tr. Vol. I, 108.) Lastly, grade IV is when the physician sees no opening at all. Dr. Connell described Catherine's airway as something "higher" than grade IV because he "didn't see any structures at all other than soft tissue" when he looked down her throat. (Jan. 7, 2014 Tr. Vol. I, 109.) The reason for such a high grade, Dr. Connell testified, would be anatomical,

and the grading does not exist until after the patient is under anesthesia and the physician can look with the laryngoscope; the grading is not visible preoperatively.

{¶ 7} Dr. Connell said that the patient note from Catherine's chart indicated that Dr. Blair attempted a Fastrach laryngeal mask airway ("LMA") intubation, which is another airway device that "doesn't enter the trachea," but the opening of the LMA "ideally is right in front of the opening of the trachea." (Jan. 7, 2014 Tr. Vol. I, 112.) Once the Fastrach LMA is placed, the anesthesiologist "can blindly try to put an endotracheal tube through the Fastrach into the trachea." (Jan. 7, 2014 Tr. Vol. I, 112.) Dr. Connell described the Fastrach LMA device as "one of those things that works really well during a PowerPoint presentation at a meeting," but "[i]n reality, it doesn't work very well." (Jan. 7, 2014 Tr. Vol. I, 112-13.) Once the Fastrach LMA is in place, the anesthesiologist would use a fiber-optic bronchoscope inserted through the Fastrach to visualize the airway opening. The note indicated that Dr. Blair's attempt with the Fastrach LMA intubation was also unsuccessful. Dr. Connell said he did not understand why Dr. Blair's note stated "[a]ttempted tube placement above epiglottis," because the airway is located below the epiglottis. (Jan. 7, 2014 Tr. Vol. I, 114.)

{¶ 8} Based on what he saw while in the operating room with Catherine, Dr. Connell opined that the reason there was no visualization of the airway was "because of her medical conditions, her rheumatoid arthritis, and her inflexibility of her neck and her mouth opening." (Jan. 7, 2014 Tr. Vol. I, 119.) Further, Dr. Connell testified that, from an anesthesiologist's perspective, if a patient indicates she has a stiff neck, that indication would raise a concern for intubation. Dr. Connell said that if a patient complained about a stiff neck and a physical examination revealed that the patient "was unable to flex or extend her neck, if she couldn't open her mouth, if she had a history of rheumatoid arthritis and needed a general anesthetic, [he] would have done an awake fiber-optic intubation." (Jan. 7, 2014 Tr. Vol. I, 95.)

{¶ 9} Steven Schrenzel, M.D., an anesthesiologist, testified as an expert witness for the Clarks. At a minimum, Dr. Schrenzel said that the practice guidelines of the American Society of Anesthesiologists require that every patient needs an airway evaluation to determine whether the patient may have difficulty managing her breathing while under anesthesia. This airway evaluation includes asking the patient to extend her

neck as far as possible, look up to the ceiling, and open her mouth as wide as possible so the anesthesiologist can determine how deep into the mouth he or she will be able to see. Dr. Schrenzel explained that the ability to extend the neck is important because extension of the neck opens up the breathing passages. Additionally, because administration of anesthesia often involves inserting objects into the patient's mouth, the anesthesiologist should make a determination of how wide the patient can open her mouth. One purpose of this initial airway evaluation is to determine whether to proceed with a laryngoscope or an awake intubation with a fiber-optic scope.

{¶ 10} Dr. Schrenzel examined Catherine in preparation for trial, four years after Dr. Blair treated her, and he testified that Catherine has "extremely limited jaw range of motion" and "absolute * * * minimal ability to open her mouth." (Jan. 7, 2014 Tr. Vol. I, 164.) Dr. Schrenzel explained a system of risk assessment called the Mallampati score that an anesthesiologist uses to determine how difficult it will be to intubate the patient. Dr. Schrenzel reviewed Catherine's medical records, and he noted that while Dr. Blair considered Catherine to have a class II airway, meaning some of the uvula was visible, the ear, nose and throat physician who performed surgery on Catherine two days after Dr. Blair treated her considered Catherine to have a class III airway, which is "a warning" that there may be "difficulty with airway management" for that patient. (Jan. 7, 2014 Tr. Vol. I, 166.) The Mallampati score given to the patient, however, is only one of the factors Dr. Schrenzel said an anesthesiologist needs to consider in predicting "whether or not somebody will be a difficult intubation or a difficult airway to manage." (Jan. 7, 2014 Tr. Vol. I, 167.) Other factors to consider include the patient's extension of his or her neck, how much he or she can open the mouth, how many fingers the doctor can get under the patient's chin, the distance between the patient's thyroid cartilage and chin, and the circumference of the patient's neck.

{¶ 11} All of Catherine's injuries were on her right side, and Dr. Schrenzel said that was an indication that the injury occurred due to the use of the laryngoscope "which is intentionally placed down the right side." (Jan. 7, 2014 Tr. Vol. I, 175.) Dr. Schrenzel testified that "the type of injury that [Catherine] sustained only results from excessive force" during the intubation process. (Jan. 7, 2014 Tr. Vol. I, 176.) Dr. Schrenzel opined that Dr. Blair's use of the laryngoscope in such a manner so as to cause this injury fell

below the standard of care. Dr. Schrenzel said the fact that Catherine sustained a perforation is proof of excessive force, and if Dr. Blair had used the appropriate amount of force, "a tear will not occur." (Jan. 7, 2014 Tr. Vol. I, 178.) Dr. Schrenzel said he has performed about 10,000 intubations using a laryngoscope and he has never had a perforation.

{¶ 12} Dr. Schrenzel also reviewed the consent form for anesthesia that Catherine signed prior to her planned hip replacement surgery, and he noted the consent form did not mention anything about a risk of a tear in the throat as a result of the intubation. He agreed that an anesthesiologist would not tell a patient that this type of tear was a risk of the procedure because "if you use proper care, it's not going to happen." (Jan. 7, 2014 Tr. Vol. I, 180.)

{¶ 13} Dr. Schrenzel said that "when a patient tells [him] that they have rheumatoid arthritis, alarm bells go off in [his] brain," because "[t]here are a lot of different ways that these patients can get in trouble with regard to anesthesia." (Jan. 7, 2014 Tr. Vol. I, 186.) His first concern when a patient has rheumatoid arthritis is airway management.

{¶ 14} Tierney testified via deposition that based on Dr. Blair's preanesthesia work-up, the plan was to administer a general anesthesia endotracheal tube. Tierney said he agreed with Dr. Blair's assessment that Catherine had a class II airway. Once he looked at her airway with the laryngoscope, Tierney said Catherine had a grade IV airway because he "could see nothing but soft tissue" and could not "visualize the epiglottis." (Jan. 8, 2014 Tr. Vol. II, 320.) Tierney clarified, however, that the Mallampati score is "totally different" than the grade given when looking with the laryngoscope blade. (Jan. 8, 2014 Tr. Vol. II, 320.) After Tierney could not visualize the airway using the laryngoscope, he turned the intubation over to Dr. Blair.

{¶ 15} Tierney said the risks associated with multiple attempts at intubating with a laryngoscope are airway swelling and bleeding. Because his attempt at using the laryngoscope yielded a view of only soft tissue, Tierney said he recommended to Dr. Blair that they use a GlideScope, which allows the user to "maintain a neutral airway" and still directly visualize the vocal cords through a camera. (Jan. 8, 2014 Tr. Vol. II, 327.) After making that comment to Dr. Blair, Tierney said Dr. Blair tried one more time to do a

direct laryngoscopy. Instead of using the GlideScope, Tiereny said Dr. Blair then attempted to intubate using a Fastrach LMA, a device that does not allow a direct visualization of the airway.

{¶ 16} Tierney testified that Catherine's preanesthesia work-up indicated she had rheumatoid arthritis, which may affect the ability to maintain her neck in a neutral position during intubation, but Tierney said it would not present any risk factors to the airway itself.

{¶ 17} Michael DiCioccio, M.D., an anesthesiologist, testified as an expert witness for appellants. Dr. DiCioccio testified that in his experience as an anesthesiologist, he "[a]lmost always" intubates hip replacement patients by laryngoscopy when they require anesthesia. (Jan. 8, 2014 Tr. Vol. II, 429.) With respect to patients with rheumatoid arthritis, Dr. DiCioccio said stiffness and immobility of the neck are not contraindications for laryngoscopy. He said that an examination of the airway makes up only one-fifth of a preoperative assessment and that other important factors for anesthesia include the patient's heart function, renal function, other diseases the patient may have, medications, drug allergies, and previous anesthetic experiences. Dr. DiCioccio said that the weight given to these factors will vary depending on the patient's individual circumstances. Even with the various preoperative considerations, Dr. DiCioccio said that until a patient is under anesthesia, an anesthesiologist cannot know how the airway will look and respond when it is time to make an intubation attempt.

{¶ 18} Dr. DiCioccio testified that a perforation is a known complication of laryngoscopy. He said that awake fiber-optic intubation is an "unpleasant" procedure and is therefore used infrequently. (Jan. 8, 2014 Tr. Vol. II, 447.)

{¶ 19} Dr. DiCioccio opined that both Dr. Blair's preoperative assessment and his actions in the operating room "met all the medical standards of care." (Jan. 8, 2014 Tr. Vol. II, 452.) He further opined that Catherine did not have a "known difficult airway" at the time that Dr. Blair attempted to intubate her; her airway did not become a "known difficult airway" until after Dr. Blair attempted to intubate her and was unsuccessful. (Jan. 8, 2014 Tr. Vol. II, 454.) In his review of Catherine's medical records, Dr. DiCioccio said he saw no evidence that Dr. Blair used "excessive force" in his attempts to intubate Catherine. (Jan. 8, 2014 Tr. Vol. II, 462.) Instead, Dr. DiCioccio said it was his opinion

that Catherine suffered a perforation because of her rheumatoid arthritis. Further, Dr. DiCioccio said that he did not consider Catherine's failed intubation attempts to present an emergent situation because she did not require a tracheostomy, which would be an indication that the anesthesiologist had actually lost her airway. Throughout the attempts to intubate her, Dr. DiCioccio said Catherine's oxygen levels, heart rhythm, and blood pressure were in normal ranges.

{¶ 20} On cross-examination, Dr. DiCioccio said he has performed around 15,000 intubations in his career, and he only saw one perforation when he was supervising a resident.

{¶ 21} Dr. Blair testified that during his career, he has cared for more than 500 patients with rheumatoid arthritis, and he has intubated these patients using "every method" of intubation, including LMA, endotracheal tubes, and fiber-optic intubations. (Jan. 9, 2014 Tr. Vol. III, 586-87.) Of the approximately 400 intubations he has performed on rheumatoid arthritis patients, Dr. Blair said he has used fiber-optic intubations on only 12 to 20 of them, while the vast majority of these patients receive a direct laryngoscopy. Relative to all patients he treats, not just those with rheumatoid arthritis, Dr. Blair said he typically performs only 2 to 4 fiber-optic intubations a month. Of the approximately 17,000 intubations he has performed in his career, Dr. Blair said he personally performed one-half of those and the other one-half he supervised a CRNA while the CRNA physically performed the intubation. In his entire 17-year career, Dr. Blair said that Catherine is the only patient he has ever encountered that he could not intubate with an endotracheal tube.

{¶ 22} Dr. Blair said the first time he saw Catherine's preoperative report from her October 18, 2010 appointment was 11 days later, when he met her in her preoperative room prior to her scheduled surgery. He said he spent a fair amount of time reviewing her medical records before surgery, and because it was clearly indicated in her chart that she had a lot of difficulty moving her neck, and because he could tell from observing her while he was in the room with her that she had very limited range of motion in her neck, he did not specifically ask her to demonstrate how well she could move her neck. Dr. Blair said that from looking at Catherine, she had a "fairly narrow" neck, which signified that she would not "have as much soft tissue in the airway" and usually makes for an easier

intubation. (Jan. 9, 2014 Tr. Vol. III, 625.) Though he did not ask Catherine to open her mouth in the preoperative area, he asked her to do so once she was in the operating room. Based on his preoperative assessment of Catherine, Dr. Blair said he was "pretty confident" he would be able to do a direct laryngoscopy and that once he was in the operating room and looked in Catherine's mouth, he "was even more confident" in his decision. (Jan. 9, 2014 Tr. Vol. III, 631.) Her tongue was not overly large, and he could see most of her uvula, giving her a Mallampati class II score.

{¶ 23} In his treatment of Catherine, Dr. Blair testified that Tierney performed the masked ventilation, and Dr. Blair administered Zemuron, which he said was the appropriate strength of paralytic drug given the type of surgical procedure and because he had "no reason to believe that [Catherine's] airway would be difficult." (Jan. 9, 2014 Tr. Vol. III, 641.)

{¶ 24} Once the Zemuron took effect, which Dr. Blair said takes about 60 seconds, Dr. Blair supervised as Tierney made the first attempt at the laryngoscopy, and, when Tierney had no success, Dr. Blair made an attempt. Dr. Blair said that ordinarily, once the laryngoscope blade is in the patient's mouth, he would be able to see the soft tissue lifting up to reveal the airway but in Catherine's case, when he lifted the blade her tissue did not move, which is something he had never seen in his 17 years of practice. Even though the view of Catherine's mouth before surgery was a class II view on the Mallampati scale, once she was under anesthesia and he was looking further down her throat at her airway, Dr. Blair said she had a grade IV airway. When Dr. Blair's own attempt at the laryngoscopy did not work, he removed the laryngoscope, mask ventilated, and asked for the GlideScope. Again when he attempted to intubate using the GlideScope, Catherine's soft tissue did not move and he still could not visualize her airway. Dr. Blair then returned to a mask ventilation and then attempted the Fastrach LMA. When the Fastrach LMA did not work, Dr. Blair went back to mask ventilation and then he made the decision that he "was going to work towards * * * waking her up." (Jan. 9, 2014 Tr. Vol. III, 672.)

{¶ 25} After he made the decision that he needed to work toward waking Catherine, Dr. Blair said that Dr. Connell came into the operating room to see if he could assist in securing an airway. Dr. Blair said that Dr. Connell suggested making an attempt with a different size blade, and because Catherine was stable enough for another attempt,

Dr. Blair agreed. Once Dr. Connell made his attempt, Dr. Blair said that Dr. Connell agreed with him that it was time to wake Catherine. During the entire time that Dr. Blair attempted to intubate Catherine, he said her oxygen saturation was at 100 percent and she was never at risk of destabilizing. At the time that he woke Catherine and took her to the recovery room, Dr. Blair did not know that a perforation had occurred. The laceration was between two and three millimeters, or approximately the size of the tip of a pen.

{¶ 26} Dr. Blair said he did not use excessive force when he attempted to intubate Catherine, but that he used the "normal amount of pressure" that he uses on every patient. (Jan. 9, 2014 Tr. Vol. III, 689.) Dr. Blair opined that Catherine suffered a laceration not because of excessive force but because her soft tissue is unusually friable due to her rheumatoid arthritis. Further, Dr. Blair said a perforation is a recognized complication of an endotracheal tube intubation.

{¶ 27} On cross-examination, Dr. Blair agreed that prior to administering anesthesia, it is important to look at range of motion in the neck, including the patient's ability to tilt her head backward. Although he performed a physical examination of Catherine in the operating room, Dr. Blair did not perform a physical examination as part of his preoperative procedure.

{¶ 28} In describing his initial attempt to intubate Catherine using the size 3 blade, Dr. Blair agreed it takes "a lot of force" to lift the tongue out of the way and compress the jaw in order to visualize the airway, but he said he used the "normal amount of force" that he applies on any patient. (Jan. 7, 2014 Tr. Vol. I, 132.) When asked whether he disagrees with Dr. Connell's opinion that he should have done a fiber-optic intubation from the start, Dr. Blair testified that Dr. Connell made that recommendation having more information than Dr. Blair had to begin with. Dr. Blair agreed that the perforation occurred during one of his attempts to intubate and not from one of the attempts of Dr. Connell or Tierney. Specifically, Dr. Blair said he thinks the perforation occurred during the "first view that [he] took with the Mac 3 laryngoscope." (Jan. 7, 2014 Tr. Vol. I, 134.) Dr. Blair said he did not agree with Dr. Connell's testimony that Dr. Connell was the one who said it was time to wake Catherine; instead, he said that he was already working toward waking her because the intubation attempts had been unsuccessful.

{¶ 29} Catherine testified that she has had rheumatoid arthritis since approximately 1975 and first started using a wheelchair in 2010. She had seen the same doctor for approximately one year before he recommended she undergo hip replacement surgery to help alleviate her pain and provide her with better mobility. Catherine scheduled the surgery for October 29, 2010. When she went for her preoperative assessment on October 18, 2010, Catherine complained of having a stiff neck. She also had difficulty opening her mouth, and she did not have any upper teeth. The medical records created as part of her preoperative appointment were made part of her medical chart available the day of her planned hip replacement surgery.

{¶ 30} On the day of her scheduled hip replacement surgery, Catherine said she met with Dr. Blair prior to entering the operating room but he did not physically examine her; instead, he looked over her chart and said "I'll see you in surgery." (Jan. 8, 2014 Tr. Vol. II, 365.) Though she does not remember actually falling asleep in the operating room, she remembers waking and then experiencing pain in her throat. In the two days after October 29, 2010, she was unable to speak or swallow her pain medication. She then had a CAT scan, and someone informed her that she had a perforation in her throat that would require surgery. The doctor who performed the emergency surgery to repair the perforation used a fiber-optic intubation through her nasal passage in order to administer the anesthesia.

{¶ 31} Catherine planned to be in the hospital for three or four days for the hip replacement surgery, but she ended up staying almost two months due to the complication from the intubation attempts. Because of the nature of her injury, Catherine required a feeding tube in order to receive nutrition after the emergency surgery to repair her throat. Even after she left the hospital, Catherine required the assistance of a home healthcare nurse to help her family learn how to use the tubes and pump necessary to feed her. She continued to require the feeding tube until the middle of January 2011. Since having the feeding tube removed, Catherine has not regained her sense of smell. After all of the complications from the intubation attempts, Catherine has still not had the hip replacement surgery that was originally scheduled for October 29, 2010.

{¶ 32} Following deliberations, the jury returned a verdict in favor of the Clarks, awarding them $500,000 in damages. The trial court journalized the jury's verdict in a

February 26, 2014 judgment entry.  The Clarks filed a motion for prejudgment interest on January 23, 2014 and a renewed motion for prejudgment interest on February 28, 2014. The trial court conducted an evidentiary hearing on the Clarks' motion for prejudgment interest on July 24, 2014 after denying appellants' motion for a continuance.  The parties filed additional briefing after the hearing, and the Clarks supplemented the record with additional exhibits in support of their argument that appellants did not act in good faith in their failure to make a settlement offer.  In a September 22, 2014 judgment entry, the trial court granted the Clarks' renewed motion for prejudgment interest, awarding $56,551 as of February 1, 2014.  Appellants timely appeal both the verdict and the award of prejudgment interest.

## II.  Assignments of Error

{¶ 33} Appellants assign the following errors for our review:

[1.] The trial court committed prejudicial error in submitting "multiple choice" narrative jury interrogatories as opposed to the requisite standard narrative jury interrogatory.

[2.] The trial court committed prejudicial error in failing to give the jury the standard "bad result" jury instruction.

[3.] The trial court abused its discretion in granting plaintiffs' motion for prejudgment interest.

## III.  First Assignment of Error – Jury Interrogatories

{¶ 34} In their first assignment of error, appellants argue the trial court erred in submitting "multiple choice" narrative jury interrogatories to the jury as opposed to a more standard "narrative" jury interrogatory.

{¶ 35} Civ.R. 49(B) provides for the use of interrogatories in conjunction with the general verdict.  In pertinent part, the rule provides:

The court shall submit written interrogatories to the jury, together with appropriate forms for a general verdict, upon request of any party prior to the commencement of argument. Counsel shall submit the proposed interrogatories to the court and to opposing counsel at such time.  The court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury, but the interrogatories shall be submitted to the jury in the form that the court approves.  The

> interrogatories may be directed to one or more determinative issues whether issues of fact or mixed issues of fact and law.

{¶ 36} "Civ.R. 49(B) 'does not require that the * * * trial judge [act as] a mere conduit who must submit all interrogatories counsel may propose.  Authority is still vested in the judge to control the substance and form of the questions.' " *Sanders v. Fridd*, 10th Dist. No. 12AP-688, 2013-Ohio-4338, ¶ 53, quoting *Ramage v. Cent. Ohio Emergency Servs., Inc.*, 64 Ohio St.3d 97, 107 (1992) (internal quotations omitted). Additionally, the trial court retains the discretion to reject submitted interrogatories "where the proposed interrogatories are ambiguous, confusing, redundant, or otherwise legally objectionable." *Id.*, citing *Ramage* at 107-08.

{¶ 37} "Proper jury interrogatories must address determinative issues and must be based upon the evidence presented." *Ramage* at paragraph three of the syllabus.  "The essential purpose to be served by interrogatories is to test the correctness of a general verdict by eliciting from the jury its assessment of the determinative issues presented by a given controversy in the context of evidence presented at trial." *Cincinnati Riverfront Coliseum, Inc. v. McNulty Co.*, 28 Ohio St.3d 333, 336-37 (1986), citing *Davison v. Flowers*, 123 Ohio St. 89 (1930).

{¶ 38} Both appellants and the Clarks submitted proposed jury interrogatories to the trial court.  The Clarks' proposed interrogatories asked the jury a series of two-part yes or no questions, instructing the jury to answer part "B" of any given question only if the jury answered in a certain way on part "A."  The five two-part interrogatories to which appellants objected stated:

> [1A.] Was Dr. John G. Blair reasonably careful under the circumstances when he assessed Catherine Clark's airway?
>
> CIRCLE YOUR ANSWER IN INK            YES or NO
>
> * * *
>
> [1B.]  Was Dr. Blair's failure to be reasonably careful under the circumstances when he assessed Catherine Clark's airway, a probable proximate cause of injury to Catherine Clark?
>
> CIRCLE YOUR ANSWER IN INK            YES or NO

* * *

[2A.] Was Dr. John G. Blair reasonably careful under the circumstances when he did not do a fiber optic intubation with respect to Catherine Clark?

CIRCLE YOUR ANSWER IN INK          YES or NO

* * *

[2B.] If a fiber optic intubation had been done, is it probable that the perforation as described in Catherine Clark's medical records would not have occurred?

CIRCLE YOUR ANSWER IN INK          YES or NO

* * *

[3A.] Was Dr. John G. Blair reasonably careful under the circumstances when he decided to put Catherine Clark to sleep for a regular intubation?

CIRCLE YOUR ANSWER IN INK          YES or NO

* * *

[3B.] Was Dr. Blair's failure to be reasonably careful under the circumstances when he decided to put Catherine Clark to sleep and attempted to intubate her, a probable proximate cause of her perforation as described in her medical records?

CIRCLE YOUR ANSWER IN INK          YES or NO

* * *

[4A.] Was Dr. John G. Blair reasonably careful under the circumstances when he decided to use Zemuron as a paralytic medication with respect to Catherine Clark?

CIRCLE YOUR ANSWER IN INK          YES or NO

* * *

[4B.] Is it probable that Dr. John G. Blair's use of Zemuron as a paralytic medication was a proximate cause of Catherine Clark's perforation as described in her medical records?

CIRCLE YOUR ANSWER IN INK          YES or NO

* * *

[5A.] Was Dr. John G. Blair reasonably careful under the circumstances in performing his intubation attempts on Catherine Clark?

CIRCLE YOUR ANSWER IN INK          YES or NO

* * *

[5B.] Is it probable that Dr. John G. Blair's intubation attempts on Catherine Clark were a proximate cause of the perforation as described in her medical records?

CIRCLE YOUR ANSWER IN INK          YES or NO

(Jury Interrogatories.)  Though appellants characterize these interrogatories as "multiple choice" interrogatories, we will refer to them as "yes/no" interrogatories.

{¶ 39} Appellants objected to the form of the Clarks' interrogatories and instead asked the trial court to submit its own proposed interrogatories.  Appellants' proposed interrogatories first asked a "yes or no" question, asking the jury whether Dr. Blair provided care and treatment "that deviated from the standard of care," and if so, asking the jury for a "narrative" response to "state specifically in what manner."  (Jan. 9, 2014 Tr. Vol. III, 772.)   The Clarks' objected to appellants' proposed interrogatories as an inaccurate statement of the law.  Following the Clarks' objection, appellants did not provide the trial court with an updated version of their proposed jury interrogatories.  The trial court ultimately provided the jury with the Clarks' proposed "yes/no" interrogatories.

{¶ 40} The Supreme Court of Ohio recently addressed the propriety of submitting an appropriately drafted jury interrogatory in a medical negligence action.  In *Moretz v. Muakkassa*, 137 Ohio St.3d 171, 2013-Ohio-4656, the Supreme Court reiterated that "[w]hen both the content and the form of a proposed interrogatory are proper, Civ.R. 49 imposes a mandatory duty upon the trial court to submit the interrogatory to the jury." *Moretz* at ¶ 79, citing *Freeman v. Norfolk & W. Ry. Co.*, 69 Ohio St.3d 611, 613 (1994). Further, " '[w]hen the plaintiff's allegations include more than one act of negligence, it is

proper to instruct the jury to specify of what the negligence consisted.' "  *Id.*, quoting *Freeman* at 614.

{¶ 41} In *Moretz,* the defendant physician submitted a proposed jury interrogatory consisting of two parts.   Part "A" asked the jury, "Have plaintiffs proven by a preponderance of the evidence that [the defendant physician] was negligent?"  If six or more jurors answered "yes" to part "A," the interrogatory instructed the jury to complete the answer to part "B," which stated "State the respect in which you find [the defendant physician] was negligent."  The trial court rejected part "B" of the jury interrogatory.  *Id.* at ¶ 77.  The Supreme Court concluded the trial court erred in refusing to submit part "B" of the interrogatory because "several distinct allegations of negligence were made," so the defendant physician "was entitled to have the jury specify of what the negligence consisted."  *Id.* at ¶ 85.  The Supreme Court further held that the *form* of the proposed jury interrogatory was proper because the "narrative form" of the proposed interrogatory "tracked the precise language that [the Supreme Court of Ohio] approved in *Freeman.*"  *Id.*  Thus, the Supreme Court concluded the trial court deprived the defendant physician of his right to test the jury verdict when it rejected his proposed interrogatory.  *Id.*

{¶ 42} Here, as in *Moretz,* the Clarks alleged several distinct allegations of negligence, so it was proper for the trial court to submit jury interrogatories asking the jury to specify of what the negligence consisted.  When the parties discussed their proposed interrogatories at trial, the Clarks pointed out that their interrogatories tracked the language used in the jury instructions.  Appellants argue, however, that although the *content* of the submitted jury interrogatories may have been proper, the *form* of the jury interrogatories was not.  More specifically, appellants assert the trial court erred in submitting the Clarks' "yes/no" jury interrogatories rather than appellants' proposed "narrative" jury interrogatory.

{¶ 43} In *Freeman,* the Supreme Court stated it had "defined proper interrogatories as those that will lead to 'findings of such a character as will test the correctness of the general verdict returned and enable the court to determine as a matter of law whether such verdict shall stand.' "  *Id.* at 613-14, quoting *Bradley v. Mansfield Rapid Transit, Inc.,* 154 Ohio St. 154, 160 (1950).  Further, "[a] properly drafted

interrogatory will elicit a statement of facts from which a conclusion of negligence or no negligence may be drawn." *Id.*, citing *Bradley* at 161.

{¶ 44} The "narrative" jury interrogatory that appellants argue is the proper form is one that asks the jury to "state the respect" in which the jury finds the defendant to be negligent. This is the language used and approved in both *Moretz* and *Freeman*. Because the Clarks' submitted interrogatories all asked the jury to answer with a "yes" or "no," appellants argue that the form of the Clarks' interrogatories was improper and had the effect of urging the jury to find Dr. Blair negligent in ways the jury might otherwise not have contemplated. Appellants do not, however, provide any authority for their proposition that "yes/no" interrogatories can unduly influence the jury to the prejudice of appellants.

{¶ 45} Appellants rely on *Moretz* for the proposition that jury interrogatories must be in a narrative form. However, we do not interpret *Moretz* to so hold. While *Moretz* expressly approves of "narrative" jury instructions, it does not contemplate whether the so-called "yes/no" interrogatories submitted by the Clarks are proper or improper. Though appellants contend the open-ended nature of the "narrative" jury interrogatory is more appropriate, appellants do not cite any authority suggesting that "yes/no" interrogatories are automatically inappropriate. Thus, we do not agree with appellants that *Moretz* automatically renders "yes/no" interrogatories inappropriate in form, and we find appellants' argument in this regard unpersuasive.

{¶ 46} Additionally, both *Moretz* and *Freeman* are clear that a trial court need not submit jury interrogatories that are improper in content. Though appellants submitted a proposed narrative jury interrogatory, the content of that interrogatory asked the jury whether Dr. Blair "deviated from the standard of care." (Jan. 9, 2014 Tr. Vol. III, 772.) Another proposed jury interrogatory asked whether the care and treatment was "within the appropriate standard of care." (Jan. 9, 2014 Tr. Vol. III, 772.) The Clarks objected to those interrogatories as an improper statement of the law, noting that the jury instructions do not use the words "deviated" or "appropriate" in reference to the standard of care. (Jan. 9, 2014 Tr. Vol. III, 773.) Though appellants stated they would have no objection to a redrafted version of their proposed interrogatory that more precisely tracked the language used in the jury instructions, appellants never submitted an

amended jury instruction to the trial court.  As the Supreme Court stated in *Freeman*, Civ.R. 49 "places the burden on the parties themselves to propose proper interrogatories." *Id.* at 614.  "If the trial court rejects a proposed interrogatory, a party may resubmit the interrogatory in an amended form," but "Civ.R. 49 does not obligate a trial court actively to assist a party in reformulating improper interrogatories."  *Id.*  Thus, to the extent appellants argue the trial court abused its discretion in not submitting appellants' proposed jury interrogatory, we find that argument unpersuasive as appellants never resubmitted a proper interrogatory in an amended form.

{¶ 47}  Having concluded that the Clarks' proposed jury interrogatories contained a correct statement of the law, the Clarks presented several distinct theories of liability, and there is no authority that precludes the use of "yes/no" interrogatories, we find the trial court did not abuse its discretion in submitting to the jury the Clarks' interrogatories. Additionally, we do not agree with appellants that the trial court deprived appellants of their right to test the verdict when it did not submit appellants' proposed interrogatories because the submission of the Clarks' interrogatories provided an adequate opportunity for both parties to test the jury's verdict by requiring a "yes/no" response to each negligence allegation.  Accordingly, we overrule appellants' first assignment of error.

## IV.  Second Assignment of Error – Jury Instructions

{¶ 48}  In their second assignment of error, appellants argue the trial court erred in failing to give the jury the "bad result" jury instruction.

{¶ 49}  The "bad result" instruction, proposed by appellants, states:

> Healthcare providers, including physicians, are not insurers or guarantors of the success of medical treatment.  They do not by the occasion of their agreement with a patient warrant that medical treatment will be successful or that nothing serious will arise as a result of its performance.  The fact that medical treatment did not fulfill expectation does not by itself without more prove that a physician was negligent.

 (Jan. 9, 2014 Tr. Vol. III, 561-62.) The parties agree that the instruction is a standard instruction included in the Ohio Jury Instructions, but they dispute its appropriateness given the evidence presented in this case.

{¶ 50} The trial court has discretion to decide to give or refuse a particular instruction, and an appellate court will not disturb that decision absent an abuse of discretion. *Columbus Steel Castings Co. v. Alliance Castings Co., LLC*, 10th Dist. No. 11AP-351, 2011-Ohio-6826, ¶ 15; *Eastman v. Stanley Works*, 180 Ohio App.3d 844, 2009-Ohio-634, ¶ 49 (10th Dist.). An "abuse of discretion" connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). "An appellate court's duty is to review the instructions as a whole, and, if taken in their entirety, the instructions fairly and correctly state the law applicable to the evidence presented at trial, reversible error will not be found merely on the possibility that the jury may have been misled." *State v. Shepard*, 10th Dist. No. 07AP-223, 2007-Ohio-5405, ¶ 7, citing *Wozniak v. Wozniak*, 90 Ohio App.3d 400, 410 (9th Dist.1993).

{¶ 51} Appellants argue that because Ohio courts routinely give the "bad result" instruction in medical malpractice actions, the trial court abused its discretion when it did not provide the instruction here. *See, e.g., Hinkle v. Cleveland Clinic Found.*, 159 Ohio App.3d 351, 2004-Ohio-6853, ¶ 86 (8th Dist.); *Callahan v. Akron Gen. Med. Ctr.*, 9th Dist. No. Civ.A. 22387, 2005-Ohio-5103, ¶ 12; *Miller v. Andrews*, 5th Dist. No. 12CA44, 2013-Ohio-2490, ¶ 51-53. The Clarks do not dispute that the "bad result" instruction is often appropriate in many medical negligence actions. Here, however, the Clarks objected to the giving of the "bad result" instruction because their expert witness, Dr. Schrenzel, expressly testified the fact that a perforation occurred is, in and of itself, proof of excessive force. Dr. Schrenzel further testified he had medical literature supporting that opinion, referring to several publications and reports reaching the same conclusion. Thus, even though both Drs. Blair and DiCioccio testified that the perforation alone, without more, was *not* proof of negligence, the Clarks argued it is for the jury to determine which, if any, expert witness it believes, and the trial court should not provide a jury instruction that tends to give more credibility to one witness over another.

{¶ 52} This court recognizes a three-part test to determine when the trial court commits reversible error in failing to give a requested instruction: "(1) the proposed instruction must be a correct statement of the law; (2) the proposed instruction must not be redundant of other instructions given; and (3) the failure to give the proposed

instruction impaired the theory of the case of the party requesting it." *Gower v. Conrad*, 146 Ohio App.3d 200, 203 (10th Dist.2001); *see also State v. Dodson*, 10th Dist. No. 10AP-603, 2011-Ohio-1092, ¶ 6.  As we noted above, the parties do not dispute that the proposed instruction is a standard Ohio Jury Instruction, and it is a correct statement of the law and we will assume arguendo that the proposed instruction is not redundant of the other instructions given.

{¶ 53} However, because we conclude that the failure to give the proposed instruction did not impair appellants' theory of the case, we do not find that the trial court committed prejudicial error in refusing to give the "bad result" instruction in this case.  In reviewing the jury charge as a whole, we are mindful that the relevant issue before the jury was whether Dr. Blair was negligent and, if so, whether that negligence was the proximate cause of injury to Catherine.  The trial court instructed the jury on this principle and further instructed the jury that "[a] physician is negligent if the physician fails to meet the required standard of care."  (Final Jury Instructions, 7.)  Additionally, the trial court instructed the jury that it was the jury alone that had "the duty of deciding what weight to give to the testimony of the expert" witnesses.  (Final Jury Instructions, 6.)  The instructions provided to the jury did not deprive appellants of their defense or of their theory of the case; rather, their argument all along was that Dr. Blair met the standard of care, and the charge to the jury adequately addressed the relevant law on that issue.  *See Booth v. Duffy Homes, Inc.*, 10th Dist. No. 07AP-680, 2008-Ohio-5261, ¶ 15 (stating "[a]lthough an instruction may not be a full and comprehensive statement of the law, as long as it correctly states the law pertinent to the issues raised in the case, its use is not reversible error").

{¶ 54} Appellants do not demonstrate anything beyond a mere possibility that the omission of the "bad result" instruction may have misled the jury, and given the broad discretion afforded to the trial court to give instructions, appellants cannot articulate how the trial court abused its discretion in not providing this instruction. The jury heard the testimony of the Clarks' expert witness and appellants' expert witness, and the instructions provided to the jury appropriately explained that it was for the jury to decide how much weight to accord that testimony.  Thus, we do not find that the trial court abused its discretion in refusing to give the requested "bad result" instruction under the

specific facts of this case.   Accordingly, we overrule appellants' second assignment of error.

## V.  Third Assignment of Error – Motion for Prejudgment Interest

{¶ 55} In their third and final assignment of error, appellants argue the trial court erred in granting the Clarks' motion for prejudgment interest.

{¶ 56} R.C. 1343.03(C) governs the award of prejudgment interest in a tort action. The statute provides:

> If, upon motion of any party to a civil action that is based on tortious conduct, that has not been settled by agreement of the parties, and in which the court has rendered a judgment, decree, or order for the payment of money, the court determines at a hearing held subsequent to the verdict or decision in the action that the party required to pay the money failed to make a good faith effort to settle the case and that the party to whom the money is to be paid did not fail to make a good faith effort to settle the case, interest on the judgment, decree, or order shall be computed.

{¶ 57} The party requesting the prejudgment interest bears the burden of demonstrating that the other party failed to make a good faith effort to settle the case. *Broadstone v. Quillen*, 162 Ohio App.3d 632, 2005-Ohio-4278, ¶ 27 (10th Dist.), citing *Loder v. Burger*, 113 Ohio App.3d 669, 674 (11th Dist.1996).  The decision of whether to grant or deny a motion for prejudgment interest is left to the sound discretion of the trial court, and an appellate court will not disturb such a decision absent an abuse of discretion.  *Id.*, citing *Loder* at 674.

{¶ 58} "A party has not 'failed to make a good faith effort to settle' under R.C. 1342.03(C) if he has (1) fully cooperated in discovery proceedings, (2) rationally evaluated his risks and potential liability, (3) not attempted to unnecessarily delay any of the proceedings, and (4) made a good faith monetary settlement offer or responded in good faith to an offer from the other party."  *Kalain v. Smith*, 25 Ohio St.3d 157 (1986), syllabus, quoting R.C. 1343.03(C).  Additionally, "[i]f a party has a good faith, objectively reasonable belief that he has no liability, he need not make a monetary settlement offer." *Id.*

{¶ 59} In granting appellees' motion for prejudgment interest, the trial court determined the Clarks negotiated in good faith to settle the case. The trial court further determined appellants failed to make a good faith effort to settle the case prior to trial. The parties agree that the only issue on appeal is whether the trial court abused its discretion in determining that appellants did not make a good faith effort to settle the case.

{¶ 60} As to the first factor relevant to whether appellants made a good faith effort to settle, neither party argues on appeal, and the record does not demonstrate, that appellants' conduct during discovery proceedings inhibited their ultimate decision not to engage in settlement negotiations.

{¶ 61} The second factor focuses on whether appellants rationally evaluated the risks and potential liability of going to trial. "[A] trial court correctly awards prejudgment interest where 'a defendant "just says no" despite a plaintiff's presentation of credible medical evidence that the defendant physician fell short of the standard of professional care required of him, * * * the plaintiff has suffered injuries, and when the causation of those injuries is arguably attributable to the defendant's conduct.' " *Jeffrey v. Marietta Mem. Hosp.*, 10th Dist. No. 11AP-492, 2013-Ohio-1055, ¶ 90, quoting *Galayda v. Lake Hosp. Sys., Inc.*, 71 Ohio St.3d 421, 429 (1994). Here, the Clarks presented the expert medical testimony of Dr. Schrenzel that Dr. Blair did not meet the standard of care required of him, but appellants still refused to make a settlement offer in response to the Clarks' initial offer. Appellants do not demonstrate how Dr. Schrenzel's testimony was anything other than "credible medical evidence," and, thus, the trial court determined appellants did not rationally evaluate the risks and, in light of the credible medical evidence presented to them, appellants did not have an objectively reasonable belief of no liability.

{¶ 62} In response, appellants argue the fact that they had retained their own expert witness to testify in their defense rendered their belief that they had no liability objectively reasonable. However, as the trial court noted, appellants were aware prior to the start of trial of the ample evidence demonstrating the Clarks had a strong case. Appellants do not articulate how the retention of an expert witness is enough to overcome the credible medical evidence presented by the Clarks such that appellants did not even

attempt to reach a settlement agreement. Additionally, though appellants insist that Dr. Blair, his trial counsel, and his liability insurance carrier continually evaluated the case throughout the course of litigation and concluded the case was defensible, the mere possibility of a favorable result at trial does not alleviate a defendant from his responsibility to rationally evaluate the risks and potential liability presented by the plaintiff's credible medical evidence. Appellants' trial counsel testified at the prejudgment interest hearing that, after evaluating all the evidence and assessing how he thought the various witnesses would perform at trial, it was his opinion that appellants had a seven in ten chance to prevail at trial. Thus, even though appellants' own counsel acknowledged a three in ten chance that appellants could lose the case, appellants' still did not make even a nominal settlement offer.

{¶ 63} The third factor is whether there was any unnecessary delay in the proceedings. In its decision and entry, the trial court stated that "a party's failure to make an offer is not dispositive of a lack of good faith," but that, depending on the case, such failure "is certainly significant." (Oct. 20, 2014 Decision and Entry Granting Plaintiff's Renewed Motion for Prejudgment Interest, 5.) To aid in its ruling on a motion for prejudgment interest, a trial court "may rely in part on its own participation during the pretrial and trial proceedings." *Pruszynski v. Reeves*, 117 Ohio St.3d 92, 2008-Ohio-510, ¶ 12. Significant to the trial court's determination that appellants did not make a good faith effort to settle the case was the fact that, during the final pretrial hearing pursuant to the original case schedule, appellants agreed to private mediation and represented a desire and willingness to negotiate with the Clarks. However, appellants determined prior to the scheduled mediation that they would not make any settlement offer, and, thus, the parties never attended the planned mediation. The trial court expressed frustration that appellants initially represented an intention to actively participate in negotiations only to subsequently refuse, thereby delaying the start of trial pursuant to the original case schedule. It appears from the trial court's decision and entry that it took issue not just with appellants' failure to make a settlement offer but the manner in which appellants so failed.

{¶ 64} The fourth and final factor looks to whether appellants, in fact, made a good faith settlement offer or responded in good faith to an offer from the other party. There is

no dispute that appellants never made any settlement offer to the Clarks prior to trial. Appellants argue the trial court relied too heavily on their failure to make a settlement offer in awarding the Clarks prejudgment interest, noting they had a good faith, objectively reasonable belief that their case was defensible and thus would have no liability. *See Kalain.* The determinative factor here is not appellants' refusal to settle the case; the determinative factor is that their refusal to settle was not objectively reasonable given the facts of this case. Having reviewed the entire record, we conclude the trial court did not abuse its discretion in determining appellants did not make a good faith effort to settle the case prior to trial thus granting the Clarks' renewed motion for prejudgment interest. We overrule appellant's third and final assignment of error.

## VI.  Disposition

{¶ 65}  Based on the forgoing reasons, we conclude the trial court did not abuse its discretion in submitting the Clarks' proposed interrogatories to the jury, in declining to instruct the jury on appellants' proposed "bad result" instruction, or in granting the Clarks' renewed motion for prejudgment interest. Having overruled appellants' three assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

TYACK and SADLER, JJ., concur.

_____