[Cite as *State v. Teitelbaum*, 2016-Ohio-3524.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                    :

      Plaintiff-Appellee/
      Cross-Appellant,                    :                    No. 14AP-310
                                    (C.P.C. No. 11CR-6440)

v.                                                :

                                      (REGULAR CALENDAR)

Daniel Teitelbaum,                               :

      Defendant-Appellant/
      Cross-Appellee.                     :

D E C I S I O N

Rendered on June 21, 2016

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Steven L. Taylor*, for appellee. **Argued:** *Steven L. Taylor.*

**On brief:** *Yeura R. Venters*, Public Defender, and *David L. Strait*, for appellant. **Argued:** *David L. Strait.*

APPEAL from the Franklin County Court of Common Pleas

LUPER SCHUSTER, J.

{¶ 1} Defendant-appellant/cross-appellee, Daniel Teitelbaum, appeals from a judgment entry of the Franklin County Court of Common Pleas finding him guilty, pursuant to jury verdict, of aggravated murder, aggravated burglary, and tampering with evidence. Additionally, plaintiff-appellee/cross-appellant, State of Ohio, cross-appeals from the trial court's judgment entry sentencing Teitelbaum to life imprisonment without the possibility of parole. For the following reasons, we affirm.

**I. Facts and Procedural History**

{¶ 2} By indictment filed December 12, 2011, the state charged Teitelbaum with one count of aggravated burglary, in violation of R.C. 2911.11, a first-degree felony; two alternative counts of aggravated murder, in violation of R.C. 2903.01, unclassified

felonies; and one count of tampering with evidence, in violation of R.C. 2921.12, a third-degree felony.  Both aggravated murder charges carried death penalty specifications, and the aggravated burglary and aggravated murder charges all carried firearm specifications. All four charges in the indictment related to the shooting death of Paul Horn.  Teitelbaum entered a plea of not guilty to all charges.

### A.  Evidence at Trial

{¶ 3}   At a jury trial commencing February 2014, Angela York, an officer with the Grove City Division of Police, testified that at 5:42 a.m. on March 11, 2011, she responded to a dispatch to 3574 Gateway Lakes Drive.  Upon arrival, the door to the apartment was unlocked.  When police pushed the door open further, they saw Horn's body just inside the door.  By the time police were called to the scene, some of Horn's blood had already dried.  There was also a salad scattered across the floor.

{¶ 4}   Dr. Jan Gorniak, then the Franklin County Coroner, testified that Horn died as a result of multiple gunshot wounds to the head and torso.  Dr. Gorniak opined that the stippling around the entrance point of the fatal gunshot wound near the right ear indicated the gun had been no more than 6 to 12 inches away when it was fired.

{¶ 5}   Gary Wilgus of the Ohio Bureau of Criminal Identification and Investigation ("BCI") testified that he processed the crime scene at Horn's apartment.  Based on the pools of blood around Horn's body and other blood found in the apartment, Wilgus estimated the blood had been left approximately 24 to 36 hours prior to his arrival at the scene.  The locations of various blood stains in the apartment suggested the bloodletting began on the sofa and progressed toward the apartment's front door.

{¶ 6}   Wilgus testified he did not detect any sign of forced entry into Horn's apartment.  Additionally, Wilgus did not see any indication that someone had searched or ransacked the apartment.  Wilgus swabbed the inside and outside doorknobs of the apartment for touch DNA.  Subsequent testing of the swabs by forensic scientist Emily Draper of the Miami Valley Regional Crime Laboratory revealed a mixture of DNA on the interior doorknob consistent with contributions from Horn, Teitelbaum, and Dennis Hopkins, Horn's roommate.  The swab from the exterior doorknob contained a mixture of DNA consistent with Horn, Hopkins, and a third person.  Based on the limited profile for

the third person, Draper testified she could not rule out Teitelbaum as the third contributor.

{¶ 7} Hopkins, Horn's roommate at the time of his death, testified that he worked for Horn at the Platinum Players Club and a second poker club. Hopkins said that on the afternoon of March 10, 2011, Horn told him to go get the game started at the second club. Hopkins testified he stayed at the second club until around midnight and then went to the Platinum Players Club to do some work in the kitchen. Around 4:15 a.m. on March 11, 2011, Hopkins said he left the Platinum Players Club to go home. When he got to the apartment, the front door was unlocked, which Hopkins said was not unusual. Upon opening the front door, Hopkins saw Horn's body on the ground and could tell Horn had been shot. Hopkins said his initial thought was Horn could have committed suicide.

{¶ 8} Remembering he had two handguns in his duffel bag inside the apartment, Hopkins stepped around Horn's body, checked his bags to make sure the guns were still inside, and took the duffel bag to his car. Hopkins testified he was inside the apartment for two or three minutes and said he did not disturb the body or anything else inside the apartment, other than his duffel bag, while he was there. Hopkins then drove back to the Platinum Players Club, without calling police, and attempted to give his bag with the guns to Minh Nguyen, who was managing the club that night. Nguyen refused to take the bag from Hopkins and told Hopkins to go back to the apartment and call police. Hopkins testified he drove back to the apartment, called 911, but did not reenter the apartment. When police arrived on the scene, Hopkins told them about moving the guns and continued to cooperate with police. Hopkins denied killing Horn.

{¶ 9} Nguyen also testified, and he said he was at work at the Platinum Players Club on the evening of March 10, 2011. Nguyen testified that Horn came into the Platinum Players Club that evening and talked to Nguyen about his concerns regarding the deposition scheduled for the next day. Nguyen identified surveillance footage of the Platinum Players Club that showed Horn leaving the club at 7:46 p.m. Nguyen said he spoke to Horn on the phone a short time later, and phone records showed Horn made that phone call at 8:49 p.m.

{¶ 10} Additionally, Nguyen testified that Hopkins came to the Platinum Players Club sometime before midnight on March 10, 2011 and stayed until 3:00 or 4:00 a.m. on

March 11, 2011. After Hopkins left, Nguyen said Hopkins then returned around 4:30 or 5:00 a.m. to tell him that Horn was dead. Nguyen testified Hopkins asked him to take possession of some weapons, but Nguyen told him no and instructed Hopkins to go back to the apartment and call police.

{¶ 11} A server at the Platinum Players Club, Kelsey Adkins, testified that she saw Horn at work on the evening of March 10, 2011. Adkins said she made Horn a salad and he left the Platinum Players Club with it at 7:46 p.m. Adkins further testified she saw Hopkins at the Platinum Players Club that evening, and he was still there when Adkins left work around 3:00 a.m.

{¶ 12} William Newman, an employee at Horn's second poker club, the Celebrities Social Club, testified he received a phone call from Horn on the evening of March 10, 2011. Phone records indicated the phone call occurred at 8:58 p.m. and lasted a little more than six minutes.

{¶ 13} Michael Anthony, an attorney who represented Horn in a commercial dispute against Teitelbaum ("the civil suit"), testified that Horn and Teitelbaum were partners in a poker business known as the Platinum Players Club. The documents from the civil suit showed Teitelbaum had sued Horn for breach of contract and breach of fiduciary duty. Teitelbaum alleged Horn had been stealing from the business. Pursuant to the partnership agreement for the Platinum Players Club, upon death of one of the partners, the survivor would have the option to buy out the decedent's interest or dissolve the business. As the civil suit progressed, the parties scheduled Horn's deposition for March 11, 2011. Anthony testified he met with Horn on March 10, 2011 to prepare for the deposition.

{¶ 14} Anthony further testified he was at his law office the next morning awaiting Horn's arrival when he received a phone call from the Grove City Division of Police informing him Horn had died. Anthony testified that police asked him not to disclose Horn's death. Though Teitelbaum's attorney in the civil suit called Anthony and contacted the assigned judge about possible sanctions for nonappearance, Anthony only indicated that Horn would not be appearing. Subsequently, Teitelbaum won a judgment giving him control of the Platinum Players Club due to Horn's death.

{¶ 15} Adrian Wills, a friend of Teitelbaum's, testified he works in construction and photography but makes extra money by buying and selling items people might need, like rare art and books. According to Wills' testimony, he and Teitelbaum had been old friends who lost touch but eventually reconnected through Facebook in July 2010. Once they reconnected, Wills and Teitelbaum began communicating through email, Facebook, and Skype. Wills testified that at some point prior to March 2011, Teitelbaum asked him during a Skype call whether Wills would be able to obtain a gun for him. Teitelbaum told him he needed the gun for self-defense, and the two discussed types of guns. Wills testified he told Teitelbaum he thought he would be able to help him and even visited a firearms shop in Santa Fe to investigate. Ultimately, Wills said he reported back to Teitelbaum that he could not help him get a gun because of the prohibition against mailing firearms across state lines.

{¶ 16} Wills testified that on March 12, 2011, the day after Horn's death, Wills was in a motorcycle accident and Teitelbaum came to visit him in Santa Fe while he was recovering. Wills testified that in his previous Skype conversations with Teitelbaum, he could see that Teitelbaum had a "mountain man" type of beard. (Tr. Vol. IX at 1737.) However, when Teitelbaum arrived in Santa Fe, Wills said Teitelbaum was clean shaven.

{¶ 17} Deborah Davis testified that she is Teitelbaum's ex-wife. In March 2011, both Davis and Teitelbaum lived in New Jersey. Davis testified that after their divorce, Teitelbaum bought a poker club but claimed it did not yield any income relevant to their ongoing child-support issues. Additionally, Davis said Teitelbaum claimed his inheritance from his mother was running out. Davis further testified that in the months leading up to March 2011, Teitelbaum's appearance had changed because he had started growing a beard a few months earlier. According to her testimony, Teitelbaum told Davis he liked the beard because people would not recognize him.

{¶ 18} Davis testified she knew about the civil suit involving the poker club. She recalled having to switch visitation weekends with Teitelbaum in March 2011 because Teitelbaum had to be in Ohio for a deposition. Rather than having his scheduled visitation with his son over the weekend, Davis said Teitelbaum took their son out to dinner on a Thursday evening in March 2011 and said he was driving to Ohio after the dinner. When Davis next saw Teitelbaum on the Tuesday after the deposition date, he

was clean shaven.  Davis said she asked Teitelbaum about the deposition and he told her "it went well.  It went really well."  (Tr. Vol. X at 1915.)  Once she learned the deposition never occurred and that Horn had been killed, Davis remembered thinking Teitelbaum's comment was inexplicable and shocking.

{¶ 19} Horn lived at the Gateway Lakes apartment complex in Grove City.  Daryl Cox, who lives at the dead end of Thrailkill Road in Grove City, testified that Thrailkill Road is very close to the Gateway Lakes apartment complex.  According to his testimony, when Cox returned home from work on the evening of March 10, 2011, it was already dark outside.  Cox said he saw a black car parked in a drainage ditch behind some bushes across the street from his house.  Cox testified he thought it was "odd" to see a vehicle parked in that location when there is a designated parking area at the end of the road, and the presence of the car in that location made him "a little bit uncomfortable."  (Tr. Vol. XII at 2381.)  Cox checked the area around his house and around the car, but he did not see anyone in the vehicle at that time.  When Cox left his house the next morning, the car was gone.

{¶ 20} Detective Richard Forney of the Grove City Division of Police testified that during his investigation, he learned Teitelbaum had obtained two different lock picking kits in January 2011.  He also identified a calendar kept by Grove City resident Jimmy Neace containing a notation that Teitelbaum stayed at Neace's home on the evening of March 10, 2011.

{¶ 21} Daniel Sachs testified he is an employee of BrickHouse Security in New York City, a company that sells security and surveillance products.  Sachs authenticated business records involving Teitelbaum, including a recorded phone call and an invoice. During the trial, the state played the recording of a phone call between Teitelbaum and BrickHouse Security from February 15, 2011.  In the phone call, Teitelbaum inquires about obtaining a GPS tracking device called the "Spark Nano Real Time" device. Teitelbaum mentioned he lived in New Jersey, expressed an interest in a ten-day rental, and provided BrickHouse Security with his email address to facilitate a future rental.

{¶ 22} Sachs then authenticated an email from BrickHouse Security to Teitelbaum sent on February 24, 2011, confirming Teitelbaum's rental of the GPS device for a ten-day period.  Including the company's grace period for mailing the device, the rental end date

was March 12, 2011.  The fee for the rental of the GPS device was $129.95, but BrickHouse Security also charged Teitelbaum an additional $100.00 when he failed to return the device and claimed he had lost it.

{¶ 23} Phillip Loesch testified that from 2009 to 2012 he was an employee of Tracking the World, a company that provides GPS devices and software support.  Loesch explained that when BrickHouse Security would sell or rent a GPS tracking device, BrickHouse contracted with Tracking the World to store the data obtained by the GPS device.

{¶ 24} Detective Forney testified that he was able to obtain the GPS data from both Tracking the World and Brickhouse Security showing the tracking locations from the GPS device that Teitelbaum had rented.  Based on the tracking locations from the GPS device, Forney said he then went to various locations along the tracking route to obtain surveillance footage.  The surveillance footage he obtained showing a man who looked like Teitelbaum was consistent with the time stamp information contained in the GPS tracking data.

{¶ 25} Robert Moledor, a detective with the Columbus Division of Police and FBI Task Force Officer, testified that he examined the GPS location data and the cell phone tower location data available from Teitelbaum's and Horn's phones.  Detective Moledor testified that on March 9, 2011 at 3:10 p.m., the GPS unit traveled west from Margate City, New Jersey, arriving in the Columbus area around 1:40 p.m. on March 10, 2011.  Detective Moledor testified that the cell tower data showing when Teitelbaum made phone calls was consistent with the GPS data.

{¶ 26} Detective Moledor testified that the GPS unit was at Neace's residence on Clime Road at 6:15 p.m. on March 10, 2011.  From there, the GPS unit traveled to the parking lot of the Gateway Lakes apartment complex at 6:30 p.m.  Next, the GPS shows stops along various businesses on Stringtown Road.  Detective Forney identified surveillance footage obtained from a White Castle restaurant on Stringtown Road.  The surveillance footage showed a dark colored Toyota sedan pull into the White Castle parking lot, Teitelbaum exited the vehicle, went inside the White Castle, entered the restroom, then exited the restaurant and returned to his vehicle.

{¶ 27} At 8:05 pm on March 10, 2011, the GPS unit arrived at the dead end of Thrailkill Road in Grove City, and it remained in that location until 9:20 p.m. Detective Moledor testified he went to this location on Thrailkill Road and that he was able to walk from the Gateway Lakes apartment complex to the dead end location on Thrailkill Road. Teitelbaum's cell phone records showed he made no phone calls during the time frame of 6:15 p.m. to 9:20 p.m. on March 10, 2011. Detective Moledor testified that the cell tower data for Horn's phone showed that at the time of the last phone call from Horn's phone at 8:58 p.m. on March 10, 2011, Horn was not yet back to his apartment but was very close, about four to seven minutes away.

{¶ 28} Detective Moledor further testified that the GPS unit left the location at Thrailkill Road at 9:20 p.m. on March 10, 2011 and next traveled to the area of Waterford Tower condominiums in Columbus, stopping there for several minutes. The manager of the Waterford Tower, Mark Reader, testified regarding the surveillance system at the Waterford Tower. The surveillance footage from Waterford Tower on March 10, 2011 from the time frame of 9:38 p.m. to 10:10 p.m. showed a man walking from an area of parked cars to and from the direction of the nearby Main Street bridge in Columbus. The man had a beard and dark hair, and he was wearing blue jeans.

{¶ 29} Detective Moledor testified that after leaving the area of the Waterford Tower, the GPS unit traveled to a Walmart store around 11:00 p.m. Surveillance footage obtained from the Walmart on Georgesville Road in Columbus showed Teitelbaum at 10:57 p.m. on March 10, 2011 wearing a dark-colored jacket, jeans, and dark-colored shoes. The surveillance video showed Teitelbaum purchase a jacket, shoes, jeans, and a pair of gloves, and he paid cash for the items. Additional surveillance footage showed Teitelbaum exit the store, walk to his car, then reenter the Walmart to purchase screws, again paying in cash. When Teitelbaum left the store for the second time, the surveillance footage showed him walk to his car, bend down in front of his vehicle, bend down at the rear of his vehicle, and then discard a white bag in a trash can before returning to his vehicle and driving away. Detective Moledor testified that the GPS unit then travelled from the Walmart back to Neace's home, arriving there around 11:40 p.m.

{¶ 30} On the morning of March 11, 2011, the GPS unit left Neace's residence and traveled back to Margate City, New Jersey. Detective Forney also testified that a short

time after arriving at Teitelbaum's address in Margate City, New Jersey, the GPS unit then sent pings from "a reef very close to [Teitelbaum's] residence out into the ocean."  (Tr. Vol. XIV at 2967.)

{¶ 31} Another old friend of Teitelbaum's, Colin Reedy, testified that he attended college with Teitelbaum but lost touch for several years after college.  At the time of trial, Reedy was serving a four-year sentence in prison for having made a straw purchase of a gun for Teitelbaum in November 2010.  Reedy testified pursuant to a cooperation agreement with the federal government and the state that he would provide information regarding Horn's murder.

{¶ 32} Eventually, Reedy and Teitelbaum reconnected and would communicate primarily through email.  When they first began corresponding, Reedy lived in Seattle, Washington and Teitelbaum lived in New Jersey.  At first, Reedy said he had only "sporadic" contact with Teitelbaum, with months sometimes passing between emails.  (Tr. Vol. XI at 2139.)  Starting around 2009, the two began communicating more regularly and would occasionally send things like books, audio books, and movies to each other.

{¶ 33} Reedy testified that the first time Teitelbaum mentioned his "business situation in Columbus" was October 2010.  (Tr. Vol. XI at 2149.)  Reedy said Teitelbaum told him that his partner was "swindling" him and had taken over $100,000 from Teitelbaum.  (Tr. Vol. XI at 2150.) When Teitelbaum began discussing the problems he was having with his business, Reedy and Teitelbaum would communicate using Skype video conferencing because Teitelbaum felt Skype was a "more secure way to communicate."  (Tr. Vol. XI at 2152.)

{¶ 34} Through their Skype conversations in October, November and December 2010, Reedy said Teitelbaum told him about the issues he was having with Horn, that Horn had locked Teitelbaum out of the Platinum Players Club, and that the lawsuit was dragging on slowly.  Reedy testified that Teitelbaum mentioned the possibility of using a lock pick that he had obtained to try to get into either the poker club or Horn's apartment. As they had more conversations, Reedy said Teitelbaum went from wanting to get surveillance and information on Horn to wanting to "get[ ] rid of" Horn.  (Tr. Vol. XI at 2159.)  Teitelbaum told Reedy that the Platinum Players Club would revert to Teitelbaum if Horn were dead.

{¶ 35} Reedy testified that Teitelbaum told him he would sometimes follow Horn to his apartment or the club, and that Teitelbaum discussed the times of day when he knew Horn would be at his apartment. Additionally, Reedy said Teitelbaum showed him a map via Skype of Horn's apartment complex, pointing out Horn's apartment and pointing out a nearby road that Teitelbaum "thought was a good place to park a car and then walk * * * to the apartment complex." (Tr. Vol. XI at 2163.) Reedy said Teitelbaum discussed whether he should wait either in a car or outside hallway of the apartment complex or whether he should use a lock pick and wait inside Horn's apartment.

{¶ 36} As the discussions progressed, Reedy said Teitelbaum asked him to help kill Horn. Reedy said Teitelbaum told him he had talked to someone in Santa Fe about helping him kill Horn but Teitelbaum decided "it wasn't going to be an option." (Tr. Vol. XI at 2179.) Reedy testified he suggested to Teitelbaum a sum of $20,000 upfront plus an additional $1,000 per month for an unspecified period of time. Reedy said he ultimately said no to the idea of killing Horn for money.

{¶ 37} However, Reedy did help Teitelbaum obtain a gun. He testified that on November 17, 2010, he purchased a semi-automatic Kel-Tec p-11 9 mm handgun at a Seattle gun store and registered it to his name. After a mandatory waiting period, Reedy returned to the gun store to take possession of the gun on November 27, 2010. Reedy testified that a short time later, he sent the gun from a UPS office in Seattle to Teitelbaum in New Jersey. A security representative for UPS identified UPS records showing delivery of the package to Teitelbaum's address in Margate, City New Jersey on December 3, 2010. By check dated January 2, 2011, Teitelbaum paid Reedy $400 for the gun, ammunition, and the cost of shipping. In these Skype conversations, Reedy said Teitelbaum had a "full beard." (Tr. Vol. XI at 2236.)

{¶ 38} Though Reedy testified that many of his conversations with Teitelbaum were via Skype, Reedy also identified printed emails he sent to Teitelbaum. In one email that Reedy sent in either October or November 2010, Reedy wrote that the gun should be either a .38 handgun or a 9 mm handgun, and he mentioned the need to factor in the mandatory waiting period before he could obtain the gun. Reedy also inquired in the email whether Teitelbaum still wanted Reedy to "take care of it" or whether Teitelbaum

had decided to do it himself.  (Tr. Vol. XI at 2222.)  Reedy testified this was an indirect discussion regarding who should kill Horn.

{¶ 39} Reedy identified another email dated November 12, 2010 in which he wrote to Teitelbaum that he had a second option for a gun and indicated he did not think only $10,000 upfront was enough money for Reedy to "do it."  (Tr. Vol. XI at 2228.)  Reedy wrote that he would ask for $20,000 upfront plus an additional $1,000 per month, and he again suggested that Teitelbaum was "the best person to do it based on knowledge, timing and money available."  (Tr. Vol. XI at 2229.)  Teitelbaum sent a reply email writing only "[l]et's Skype this morning."  (Tr. Vol. XI at 2232.)  In a third email Reedy identified, Reedy wrote to Teitelbaum and referenced their "scheming" about "ending * * * a life." (Tr. Vol. XI at 2234.)

{¶ 40} Reedy testified that in January 2011, he left the country to go on a backpacking trip around the world, and he did not return to the United States until October 2011.  The stamps on his passport showed he was in Indonesia, Thailand and Laos in March and April 2011.  He was still overseas in August 2011 when the Federal Bureau of Investigation ("FBI") contacted him to discuss whether he had any information regarding Horn's murder.  Reedy testified he contacted Teitelbaum via Skype to let Teitelbaum know that the FBI had contacted him.  Reedy said Teitelbaum told him that the FBI searched his apartment and seized his computer and some other items.  Reedy said Teitelbaum also indicated to him that the gun was in a river.

{¶ 41} In September 2011, Reedy said Teitelbaum came to visit him in Vietnam, and Teitelbaum no longer had a beard.  Reedy said they discussed Horn's murder and that Teitelbaum again told him he threw the gun in a river.  Reedy told Teitelbaum he thought he might need a lawyer, Reedy said Teitelbaum agreed to give him $1,500 to pay an attorney.  Reedy testified that he told Teitelbaum he intended to talk to the police and that Teitelbaum told him "just don't say anything."  (Tr. Vol. XI at 2285.)

{¶ 42} Reedy testified that on November 28, 2011, he met with police and FBI in Columbus, Ohio.  During a break from his interviews, Reedy left the room and wrote in a text message that his attorney was negotiating with the prosecutors and police.  Reedy said he intended to send that text message to his girlfriend but mistakenly sent it to Teitelbaum instead.  When Reedy told his attorney of his mistake, his attorney and the

law enforcement officers took a photograph of the text message and told Reedy to send another message to Teitelbaum saying "just kidding."  (Tr. Vol. XI at 2288.)  Teitelbaum did not respond to these text messages.  The FBI seized Teitelbaum's phone when it searched his residence on May 5, 2011, but Teitelbaum could still monitor text messages by other means.

{¶ 43} James Smith, a forensic scientist with BCI, testified that the bullets fired at Horn were all fired from the same gun, and the five casings found at Horn's apartment were all fired by the same gun.  Smith testified the bullets were all 9 mm and were fired from a barrel with characteristics that are consistent with the gun Reedy purchased and sent to Teitelbaum.  Additionally, Smith testified his testing excluded both Hopkins' 9 mm gun and another 9 mm weapon used by another Platinum Players Club employee as the weapon that could have fired the bullets.

{¶ 44} Special Agent Kristin Cadieux of the FBI testified she was involved in obtaining search warrants for Teitelbaum's residence in New Jersey and his 2006 Toyota Avalon.  Among the items seized in the execution of the search warrants was Teitelbaum's personal journal.  Davis, Teitelbaum's ex-wife, also testified she knew that Teitelbaum kept a journal in a spiral notebook, and she identified such a notebook that the FBI had seized from his home as containing Teitelbaum's handwriting.

{¶ 45} Special Agent Cadieux read various entries from Teitelbaum's journal.  In an entry dated May 4, 2010, Teitelbaum wrote he had made big mistakes in his life, including "pick[ing] a horrible, horrible business partner."  (Tr. Vol. XII at 2602.)  In an entry dated May 29, 2010, Teitelbaum wrote about Horn trying to "rob [him] blind," and further wrote "[o]ne of the worst aspects of the whole debacle has been the thought of [Horn] running around the club telling everyone how all this is my fault and basically parading round like he owns the club and I'm an idiot."  (Tr. Vol XII at 2602.)  Teitelbaum also expressed frustration in the journal entries with the slow pace of the litigation with Horn, writing on November 26, 2010 "[t]he American legal system is a joke and cannot be relied upon to deliver justice."  (Tr. Vol. XII at 2611.)

{¶ 46} In October of 2010, Teitelbaum wrote he could not "get Ohio out of [his] mind lately * * * it's getting bad."  (Tr. V0l. XII at 2605.)  He then wrote of his need to "do

something and soon." (Tr. VOl. XII at 2606.)  Teitelbaum also wrote in some entries about his need to contact Wills and Reedy, and he later wrote about having spoken to Wills.

{¶ 47} Though his entries never explicitly mentioned a plan to kill Horn, Teitelbaum described the dark clothing he would wear when he "do[es] it."  (Tr. Vol. XII at 2606.)  He also expressed some doubts about whether he was "the man for the job," and wrote he "need[ed] more training."  (Tr. VOl. XII at 2614.)  On January 25, 2011, he wrote he "really would benefit from borrowing a car," but wrote his brother would not lend him one.  (Tr. VOl. XII at 2615.)  On February 19, 2011, he wrote that "[t]here is something on [his] mind all the time, and [he does not] want to write about it," but he "need[s] to do this job."  (Tr. VOl. XII at 2616.)

{¶ 48} Special Agent Cadieux testified there were no journal entries on the date of Horn's death.  However, on August 10, 2011, five months after Horn's death, Teitelbaum wrote as his last entry in the journal "I'm alive!  Happy to be alive.  Jacob is alive.  Deb is alive.  Joanne is alive.  Nick Enright is alive.  Paul Horn is dead."  (Tr. VOl. XII at 2619.)  Teitelbaum further wrote in that last entry he was drinking coffee, had plans to see his son, plans with his girlfriend, and that "[s]ure beats being dead or in prison," stating he should turn his life story into a book.  (Tr. VOl. XII at 2619.)  He wrote his "depression seems totally lifted."  (Tr. VOl. XII at 2620.)

{¶ 49} Officer John Gagnon of the Columbus Division of Police testified that both the Columbus Police and the FBI searched the Scioto River in downtown Columbus in the area around the Main Street bridge. Officer Gagnon testified neither the Columbus Division of Police nor the FBI ever recovered a gun from the river, but he described that particular area of the river as a difficult and dangerous area to search.  Officer Gagnon said that in the time frame of March 9 to 11, 2011, the river was moving at a "rapids" rate. (Tr. VOl. XII at 2437.)

{¶ 50} Jerry Eagan, a United States Customs and Border Protection Officer, testified that he worked the border post at the Lewiston-Queenston Bridge in the area of Buffalo and Niagara Falls, New York from 2010 to 2013.  Eagan identified records showing Teitelbaum came back into the United States from Canada alone in his car on November 28, 2011.  The records indicated a "Canadian refusal," meaning Teitelbaum had

attempted to enter Canada but had been refused and sent back to the United States.  (Tr. Vol. X at 1978.)

### B.  Jury Instructions and Deliberations

{¶ 51} During jury instructions, the trial court paused in the middle of its instruction regarding alternate jurors and engaged in some discussion with counsel off the record.  Following that discussion, the trial court stated:

> I had a question about this next instruction, and counsel all agree it is appropriate* * *.
>
> The alternates - - when you retire to the jury room, the 12 regular jurors will select a foreperson.  So the two alternates will not participate in that process.  The alternates should listen to the deliberations but must not participate in the deliberations, unless, until, if ever, they are called upon to serve as a regular juror.
>
> Alternate jurors were selected to serve in the event of any misfortune befalling a member of the panel.  As yet that has fortunately not occurred.  Nonetheless, your presence is still required while this jury is deliberating.

 (Tr. Vol. XVII at 3462-63.)  The jury then retired to deliberate and the alternate jurors went into the jury room with the regular jurors.

{¶ 52} Shortly after the jury began deliberating, the bailiff notified the trial court of two questions from the jury.  The second question was from an individual juror and read "Can a juror be removed for stating he shouldn't have been picked and he has trouble and doesn't like considering circumstantial evidence?"  (Tr. Vol. XVII at 3466.)  Counsel for both parties agreed to the trial court's response of "The court has received a question from an individual juror.  The court may not answer questions like this in the future.  While an individual may ask a question, it must come from the entire panel."  (Tr. Vol. XVII at 3466-67.)

{¶ 53} Approximately one hour later, the trial court received another question from the jury.  Thereafter, the following exchange occurred:

> THE COURT: For the record court has received another question:

"Can [alternate juror No. 1] be accused" - - I assume it means recused -- "from the jury because its to hard for him to listen in without commenting or putting in his two sense." (sic)

As a way of background, I believe this question is the result of the last question from the jury where I indicated - - please be seated - - where I said to the jury the question has to come from the panel.

Again for the record since that time, [alternate juror No. 1] did approach my bailiff expressing his problem with sitting there not participating. Is that correct, Cheryl?

THE BAILIFF: That's correct.

THE COURT: She asked me what to do. I told him - - I told her to go and simply tell him that the instructions were that he could not participate. I asked that she communicate that information. I asked Lynn to go with her so that there would be a witness to that.

And I believe that was the information you gave; is that correct?

THE BAILIFF: Yes.

THE COURT: And you were there, Lynn?

MS. HARDESTY: Uh-huh.

THE COURT: And he expressed some difficulty at that time?

THE BAILIFF: Yes.

THE COURT: So we're now back with that question. We do have a juror that's I think problematic. However, with the agreement of counsel, I will bring [alternate juror No. 1] back in and express to him the importance of being an alternate, how important an alternate is to making sure that we have a full jury, how he said he would follow the law, and see if we can't agree on to get him to participate by sitting there.

(Tr. Vol. XVII at 3468-70.) Neither party objected to the trial court's proposed plan to speak to the alternate juror.

{¶ 54} At that time, the trial court called the alternate juror, ("alternate juror No. 1"), into the courtroom. The trial court first confirmed that alternate juror No. 1 was the one who submitted the earlier question coming from an individual rather than the whole panel regarding difficulty considering circumstantial evidence. Alternate juror No. 1 stated he thought the alternates "would be away from the deliberation part," and "didn't realize that, you know, sitting there not being able to say anything would trigger my anxiety." (Tr. Vol. XVII at 3473-74.) After some more discussion, alternate juror No. 1 agreed to return to the jury room and obey the instruction not to participate.

{¶ 55} The next morning, the jury resumed deliberations. The trial court then had the following discussion with counsel:

> THE COURT: It's been brought to my attention - - and I raised the issue about whether or not the alternates should be back with the jury. Both sides approached the bench at my request, and both sides agreed that the alternates should go back with a limited instruction.
>
> Is that correct on behalf of the state?
>
> MS. FARBACHER: Yes, Your Honor.
>
> THE COURT: Is that correct on behalf of defense?
>
> MR. NEMANN: Yes, Your Honor.
>
> THE COURT: Since that time, it's come to everyone's attention that I was right, that the alternates should not be back there.
>
> And that's not the issue; it's how to remedy the issue. The suggestion is that we bring the jury back, advise them that the alternates should not have been back, sequester the alternates separately, and tell the jury to continue deliberations; start their deliberations over with the same instructions.

(Tr. Vol. XVII at 3477-78.) After allowing defense counsel time to confer with his client, both parties agreed to the trial court's proposed approach of separately sequestering the alternate jurors and instructing the jury to begin its deliberations anew. The trial court then called the jury back into the courtroom and stated:

> When we gave you our final instructions, there was some discussion - - I know you were aware of it at the bench - - as to

whether or not the alternates should be back during deliberations. And it was determined by counsel that you should be.

With those limitations we have all agreed that you should not be back there during those deliberations. You will be sequestered. You will still spend the night and do everything else. But you will remain separate from the rest of the panel.

Cheryl will take you. You're welcome when you are in that room to talk with each other, to read, to visit, to do anything you want other than - - you know what's coming next - - discuss this case.

To the rest of you, you are to continue. Start your deliberations over subject to the same instructions that I gave you, okay, how long it takes to get back to where you are now but to refocus yourself and start over. With that instruction I apologize for any inconvenience.

(Tr. Vol. XVII at 3480-81.) The jury then resumed its deliberations without the alternate jurors present.

{¶ 56} Approximately 50 minutes later, the jury notified the trial court it had reached a verdict. The jury returned guilty verdicts as to all counts and specifications.

{¶ 57} On March 17, 2014, prior to the mitigation phase of sentencing, Teitelbaum filed a motion for a mistrial. Teitelbaum's stated reasons for seeking a new trial were an alleged violation of then-current R.C. 2313.37(C) from the trial court allowing the alternate jurors to be present in the jury room during a portion of deliberations. The trial court construed the motion as a post-trial motion for new trial pursuant to Crim.R. 33. Though acknowledging it was error to allow the alternate jurors to be present in the jury room during deliberations, the trial court nonetheless denied Teitelbaum's motion for new trial, concluding Teitelbaum was unable to demonstrate plain error from the trial court's error. Additionally, the trial court concluded any error from the presence of the alternate jurors during deliberations was invited error.

{¶ 58} Prior to commencing the sentencing phase, the trial court dismissed alternate juror No. 1 from further participation in the case after alternate juror No. 1 presented a doctor's note detailing his anxiety from being sequestered.

## C. Penalty Phase

{¶ 59} On March 21, 2014, the case proceeded to the penalty phase on the aggravated murder counts. During an initial discussion about the jury instructions, the court stated it intended to instruct the jury that "the defendant does not have any burden of proof" and that "the aggravated murder itself is not an aggravating circumstance." (Tr. Vol. XVIII at 3504, 3508.) The state objected to both instructions. The court overruled the state's objections.

{¶ 60} In the preliminary penalty phase instructions, the court instructed the jury:

> In this case the aggravating circumstance is precisely that set out in your verdict on Specification One to Counts Two and Three of the indictment.
>
> It is as follows: That the defendant purposely caused the death of Paul Horn while committing or attempting to commit or fleeing immediately after committing or attempting to commit aggravated burglary, and the defendant personally committed each act which constituted the aggravated murder.
>
> This aggravating circumstance was proven in the trial phase, and it is not necessary for the State of Ohio to present further evidence to you regarding this aggravating circumstance.
>
> However, only this aggravating circumstance may be considered by you during the sentencing proceeding. The aggravated murder itself is not an aggravating circumstance. Because you found that an aggravating circumstance is present, the law provides the following four sentencing options for your consideration:
>
> (A) life imprisonment without parole eligibility for 25 full years;
>
> (B) life imprisonment without parole eligibility for 30 full years;
>
> (C) life imprisonment without the possibility of parole;
>
> (D) death.
>
> You are here today to consider which of these sentences to impose. The aggravating circumstance will be weighed against the mitigating factors that have been or will be presented.

> Mitigating factors are factors about an individual or an offense that weigh in favor of a decision that a life sentence rather than a death sentence is appropriate.
>
> In order for you to decide that the sentence of death shall be imposed upon Daniel Teitelbaum, the State of Ohio must prove beyond a reasonable doubt that the aggravating circumstance of which the defendant was found guilty is sufficient to outweigh the factors in mitigation of imposing the death sentence. The defendant does not have any burden of proof.

(Tr. Vol. XVIII at 3542-44.)

{¶ 61} The state did not present any witnesses during the penalty phase. Teitelbaum called several witnesses in mitigation. In the final penalty phase instructions, the court instructed the jury as follows:

> In order for you to decide the sentence of death shall be imposed upon Daniel Teitelbaum, the State of Ohio must prove beyond a reasonable doubt that the aggravating circumstances of which the defendant was found guilty is sufficient to outweigh the factors in mitigation of imposing the death sentence.
>
> The defendant does not have any burden of proof. Reasonable doubt is present when after you have carefully considered and compared all the evidence, you cannot say you are firmly convinced that the aggravating circumstance of which the defendant was found guilty outweighs the mitigating factors.
>
> * * *
>
> The aggravating circumstance that you shall consider as to Count Two is that the defendant purposely caused the death of Paul Horn while committing or attempting to commit or fleeing immediately after committing or attempting to commit aggravated burglary, and the defendant was personally committed - - and the defendant personally committed each act which constituted the aggravated murder.
>
> The aggravating circumstance you shall consider as to Count Three is that the defendant purposely caused the death of Paul Horn while committing or attempting to commit or fleeing immediately after committing or attempting to commit

aggravated burglary, and the defendant personally committed each act which constituted the aggravated murder.

The aggravated murder itself is not an aggravating circumstance. You may only consider the aggravating circumstance that was just described to you and which accompanied the aggravated murder.

(Tr. Vol. XVIII at 3704-07.)

{¶ 62} Following the mitigation hearing on the capital specification, the jury was unable to agree on whether aggravating circumstances outweighed mitigating factors beyond a reasonable doubt. The jury unanimously found that the court should impose a sentence of life without the possibility of parole.

{¶ 63} The trial court conducted a sentencing hearing on March 31, 2014 and imposed a sentence of life without the possibility of parole on the aggravated murder charge in Count Two of the indictment to be served concurrent with a six-year sentence on the aggravated burglary charge and a one-year sentence on the tampering with evidence charge. The trial court further found the aggravated murder charge in Count Three merged with the aggravated murder charge in Count Two of the indictment. Additionally, the trial court imposed consecutive three-year terms for the firearm specifications attached to Counts One and Two. The court journalized Teitelbaum's convictions and sentence in an April 4, 2014 judgment entry. Teitelbaum timely appeals. The state sought leave to file a cross-appeal, which this court granted.

## II. Assignments of Error

{¶ 64} Teitelbaum assigns the following errors for our review:

[1.] The presence and participation of an alternate juror during deliberations violated Appellant's right to a jury trial as guaranteed by Section 5, Article I, of the Ohio Constitution and the Fifth and Fourteenth Amendments to the United States Constitution.

[2.] The trial court erred by failing to take steps necessary to correct the error arising from the presence and participation of alternate jurors in deliberations.

[3.] The trial court erred by denying Appellant's motion for mistrial (new trial) when the presence and participation of an

alternate juror in deliberations violated his constitutional right to a jury trial.

[4.] The trial court's erroneous, inconsistent, and contradictory evidentiary rulings constituted an abuse of discretion and violated Appellant's constitutional right to a fair trial.

[5.] The trial court erred by failing to record all sidebar conferences as required by Crim.R. 22.

[6.] Appellant's conviction and sentence are void because his right to a unanimous jury verdict under Crim.R. 31(A) was violated by the court's failure to properly instruct the jury.

[7.] Defendant-Appellant was denied effective assistance of counsel in violation of the Sixth and Fourteenth Amendments to the United States Constitution and Section 10, Article I of the Ohio Constitution.

[8.] Appellant's convictions are against the manifest weight of the evidence.

[9.] The cumulative effect of the errors advanced in this brief resulted a violation of Appellant's right to a fair trial and thus entitles him to a new trial.

{¶ 65} The state assigns the following errors for our review:

[1.] The trial court erred and abused its discretion when it instructed the jury in the penalty phase that defendant bore no burden of proof.

[2.] The trial court erred and abused its discretion when it instructed the jury in the penalty phase that the aggravated murder itself is not an aggravating circumstance.

## III.  First and Second Assignments of Error – Alternate Juror

{¶ 66} Teitelbaum's first and second assignments of error are interrelated and we address them jointly.  Taken together, they assert the trial court erred in permitting an alternate juror to be present during jury deliberations.

{¶ 67} Pursuant to Crim.R. 24(G)(1), the trial court "may retain alternate jurors after the jury retires to deliberate.  The court must ensure that a retained alternate does not discuss the case with anyone until that alternate replaces a juror or is discharged.  If

an alternate replaces a juror after deliberations have begun, the court must instruct the jury to being its deliberations anew." *See also* Crim.R. 24(G)(2) (specifically applying the rule enunciated in Crim.R. 24(G)(1) to capital cases as well).

{¶ 68} The Supreme Court of Ohio "has consistently stated that allowing alternate jurors to be present during jury deliberations is error." *State v. Downour*, 126 Ohio St.3d 508, 2010-Ohio-4503, ¶ 7, citing *State v. Murphy*, 91 Ohio St.3d 516, 531 (2001) (stating "[i]t is generally regarded as erroneous to permit alternates to sit in on jury deliberations"), and *State v. Jackson*, 92 Ohio St.3d 436, 440 (2001) (stating "[t]he trial court clearly erred * * * in allowing the alternate jurors to remain present during deliberations"). Further, in *State v. Gross*, 97 Ohio St.3d 121, 2002-Ohio-5524, the Supreme Court concluded that "reversible error occurs where, over objection, an alternate juror participates in jury deliberations resulting in an outcome adverse to a defendant and either (1) the state has not shown the error to be harmless, or (2) the trial court has not cured the error." *Gross* at ¶ 137.

{¶ 69} In *Downour*, the Supreme Court clarified the burden-shifting that occurs when a trial court permits an alternate juror to be present during jury deliberations, stating "it is the *presence* of the alternate jurors that shifts the burden to the state to show that any error is harmless." (Emphasis sic.) *Downour* at ¶ 9. The Supreme Court also reiterated that " ' "[i]n theory, the presence of alternate jurors during jury deliberations might prejudice a defendant in two different ways: either because the alternates actually participated in the deliberations, verbally or through 'body language' or because the alternates' presence exerted a 'chilling' effect on the regular jurors." ' " *Id.*, quoting *Gross* at ¶ 135, quoting *United States v. Olano*, 507 U.S. 725, 739 (1993).

{¶ 70} Though Teitelbaum urges us to find presumptive reversible error from the mere presence of the alternate jurors during deliberations, we are mindful that *Downour* deals specifically with the presence of an alternate juror allowed over a defendant's objection. Here, Teitelbaum did not object to presence of the alternate jurors or to the instructions regarding the presence of the alternate jurors. Thus, as the Supreme Court reiterated in *Downour*, when a defendant does not object to the presence of an alternate juror, the court analyzes the error under a plain error analysis that does not presume prejudice. *Downour* at ¶ 7, citing *Gross* at ¶ 133, citing *Murphy* and *Jackson*. An

appellate court recognizes plain error with the utmost caution, under exceptional circumstances, and only to prevent a miscarriage of justice. *State v. Pilgrim*, 184 Ohio App.3d 675, 2009-Ohio-5357, ¶ 58 (10th Dist.), citing *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, ¶ 139.

{¶ 71} For an error to be a "plain error" under Crim.R. 52(B), it must satisfy three prongs: (1) there must be an error, meaning a deviation from a legal rule, (2) the error must be "plain," meaning an "obvious" defect in the trial proceedings, and (3) the error must have affected "substantial rights," meaning the error must have affected the outcome of the trial. *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). We agree with Teitelbaum that the mere presence of the alternate jurors during deliberations is sufficient to satisfy the first two prongs of the plain error test. *See Downour* at ¶ 7. At issue here is whether Teitelbaum can show any prejudice from the presence of the alternate juror during deliberations.

{¶ 72} Teitelbaum, relying on federal cases, argues that even if this court cannot presume prejudice from the mere presence of an alternate juror, we should nonetheless presume prejudice where there is evidence of actual participation by the alternate juror. *See United States v. Acevedo,* 141 F.3d 1421, 1424 (11th Cir.1998) (concluding "that once the alternate participates in any way -- whether through words or gestures -- prejudice is manifest"); *Manning v. Huffman*, 269 F.3d 720, 726 (6th Cir.2001) (stating "evidence that an alternate juror participated in jury deliberations is sufficient to demonstrate prejudice"). Though the Supreme Court has stated it will not presume prejudice, it noted in *Murphy* that the defendant could not demonstrate prejudice because, for example, there was no showing that "the alternates disobeyed the court's instructions [not to participate] by participating in the deliberations, either verbally or through body language, or that their presence chilled the deliberative process." *Murphy* at 533. *See also Jackson* at 440 (noting the defendant did not demonstrate the alternate jurors ignored the court's instructions not to participate or otherwise affected deliberations and concluding that "although it was improper for the trial court to instruct the alternate jurors to remain present during deliberations, appellant's argument that he was denied a fair trial lacks merit"). The logical corollary, then, is that a showing that an alternate juror *did* actually participate in deliberations would be sufficient to demonstrate prejudice.

{¶ 73} We recognize that the Supreme Court of Ohio has not squarely addressed the question of whether a showing of actual participation by an alternate juror is sufficient to demonstrate prejudice for purposes of a plain error analysis. Here, however, we need not determine whether the alternate juror actually participated in deliberations because even if he did, the trial court acted to remedy the situation before the jury reached a verdict. As the Supreme Court noted in *Gross*, "reversible error occurs where, over objection, an alternate juror participates in jury deliberations resulting in an outcome adverse to a defendant and either (1) the state has not shown the error to be harmless, or (2) the trial court has not cured the error." *Gross* at 154. Though there was no objection here, the trial court recognized its error before the jury had reached a verdict; at that point, the trial court stopped deliberations, removed the alternate jurors from the room, and instructed the jury to begin its deliberations anew. We conclude this is a sufficient curative instruction.

{¶ 74} To the extent Teitelbaum argues the curative instruction was insufficient and should have offered more guidance to the jury on precisely *how* to start its deliberations over, Teitelbaum presents no authority to support his position. We do not find the trial court's instruction to "start your deliberations over" to be ambiguous or unclear. Because the trial court acted to correct its error before the jury reached a verdict, we conclude Teitelbaum is unable to show the outcome of his trial would have been different but for the trial court's error in allowing the alternates to be present during a portion of deliberations. Thus, because Teitelbaum cannot demonstrate prejudice, we do not find reversible error from the presence of the alternate jurors during a portion of deliberations.

{¶ 75} Additionally, we are mindful of the doctrine of invited error. "Under the invited-error doctrine, '[a] party will not be permitted to take advantage of an error which he himself invited or induced.' " *State v. Bey*, 85 Ohio St.3d 487, 493 (1999), quoting *Hal Artz Lincoln-Mercury, Inc. v. Ford Motor Co.*, 28 Ohio St.3d 20 (1986), paragraph one of the syllabus. *See also State v. Jennings*, 10th Dist. No. 09AP-70, 2009-Ohio-6840, ¶ 75, citing *State v. Bogovich*, 10th Dist. No. 07AP-774, 2008-Ohio-3100, ¶ 10 (explaining the invited error doctrine precludes a claim or reversible plain error).

{¶ 76} Here, both parties agreed to the trial court's initial instructions to the jury regarding the presence of the alternate jurors in the deliberation room. Even when the court paused during instructions to clarify that both parties wanted to send the alternates into the jury room, counsel for Teitelbaum again affirmatively agreed. Moreover, counsel for Teitelbaum never objected to the alternate jurors' presence prior to the verdict, and counsel for Teitelbaum affirmatively agreed with the court's remedy of removing the alternates and offering a curative instruction to begin deliberations anew. " 'This is precisely the situation the invited error doctrine seeks to avert.' " *Jennings* at ¶ 76, quoting *State v. Doss*, 8th Dist. No. 84433, 2005-Ohio-775, ¶ 7, citing *United States v. Jernigan*, 341 F.3d 1273, 1290 (11th Cir.2003) (holding a criminal defendant "may not make an affirmative, apparently strategic decision at trial and then complain on appeal that the result of that decision constitutes reversible error").

{¶ 77} Thus, both because Teitelbaum does not demonstrate plain error from the presence of the alternate jurors during deliberations and because any error amounts to invited error, we overrule Teitelbaum's first and second assignments of error.

**IV. Third Assignment of Error – Motion for New Trial**

{¶ 78} In his third assignment of error, Teitelbaum argues the trial court erred in denying his motion for mistrial. Because Teitelbaum filed his motion for mistrial after the jury had reached a verdict, the trial court appropriately construed his motion as a motion for new trial under Crim.R. 33. *See, e.g., State v. Williams*, 6th Dist. No. L-13-1053, 2014-Ohio-2834, ¶ 58 (construing post-verdict motion for mistrial as Crim.R. 33(A) motion for new trial). Thus, we will review Teitelbaum's third assignment of error to determine whether the trial court erred in denying his motion for new trial.

{¶ 79} The decision of whether to grant a new trial pursuant to Crim.R. 33 rests within the sound discretion of the trial court, and we will not disturb that decision absent an abuse of discretion. *State v. Salinas*, 10th Dist. No. 09AP-1201, 2010-Ohio-4738, ¶ 40, citing *State v. Schiebel*, 55 Ohio St.3d 71, 76 (1990). An abuse of discretion connotes a decision that was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶ 80} Pursuant to Crim.R. 33(A), a trial court may grant a new trial due to an "[i]rregularity in the proceedings * * * because of which the defendant was prevented

from having a fair trial," or "[m]isconduct of the jury." Crim.R. 33(A)(1) through (2). The language of Crim.R. 33 makes it clear that a trial court should not grant a new trial " 'unless it affirmatively appears from the record that a defendant was prejudiced by one of the grounds stated in the rule, or was thereby prevented from having a fair trial.' " *Salinas* at ¶ 41, quoting *Columbus v. Carroll*, 10th Dist. No. 96APC01-90 (Aug. 27, 1996).

{¶ 81} The basis for Teitelbaum's motion for new trial was the trial court's alleged error in permitting the alternate jurors to be present for a portion of the jury's deliberations. As we outlined in our resolution of Teitelbaum's first two assignments of error, Teitelbaum is unable to demonstrate any prejudice from this error because the trial court recognized its own error before the jury reached a verdict and issued a sufficient curative instruction. Additionally, any error was invited error as Teitelbaum agreed not only to have the alternate jurors present initially, but then agreed with the trial court's proposed remedy. For those reasons, the record does not demonstrate that Teitelbaum was prejudiced or was prevented from having a fair trial, and the trial court did not abuse its discretion in denying Teitelbaum's motion for new trial. We overrule Teitelbaum's third assignment of error.

## V. Fourth Assignment of Error – Evidentiary Rulings

{¶ 82} In his fourth assignment of error, Teitelbaum argues the trial court abused its discretion in making several evidentiary rulings. More specifically, Teitelbaum challenges the trial court's rulings regarding the admissibility and authentication of the emails Teitelbaum's ex-wife obtained from his email account. Generally, the admission or exclusion of evidence lies in the sound discretion of the trial court. *State v. Darazim*, 10th Dist. No. 14AP-203, 2014-Ohio-5304, ¶ 33, citing *State v. Bartolomeo*, 10th Dist. No. 08AP-969, 2009-Ohio-3086, ¶ 24.

{¶ 83} At trial, the state sought to introduce the printouts of the emails between Reedy and Teitelbaum. The state proffered what Davis's testimony would be regarding how she obtained the emails by accessing Teitelbaum's email account without his knowledge using his password, printed out portions of the emails, and mailed them anonymously to the Grove City police, but Teitelbaum objected to Davis providing any testimony regarding the emails. The trial court sustained the objection, ruling Davis could "not talk about these e-mails in any way." (Tr. Vol. X at 1918.) Later, when Reedy

testified, the trial court permitted Reedy to authenticate the printouts of the emails over Teitelbaum's objection.  On appeal, Teitelbaum argues these evidentiary rulings are inconsistent.

### A.  Authentication

{¶ 84} Initially, Teitelbaum argues the trial court abused its discretion in permitting Reedy to authenticate the printouts of the emails because it was Davis, not Reedy, who accessed the emails and copied them into Word documents before printing them out.  Thus, Teitelbaum argues Reedy lacked the requisite personal knowledge to authenticate the emails.  "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."  Evid.R. 901(A).  Further, testimony of a witness with knowledge "that a matter is what it is claimed to be" is one way of establishing authenticity.  Evid.R. 901(B)(1).  Here, Reedy testified that the print-outs of the emails were authentic copies of the emails he had exchanged with Teitelbaum, and he provided further testimony regarding what the emails said and their timing in relation to Teitelbaum's plot to kill Horn.  As one of the parties to the emails, Reedy was a witness with knowledge as required by Evid.R. 901, and his testimony was sufficient to authenticate the emails.  *See State v. Bell*, 12th Dist. No. CA2008-05-044, 2009-Ohio-2335, ¶ 31 (testimony of one of the parties to a series of emails and online conversations was sufficient to authenticate printouts of the emails and online conversations).  Thus, we find no abuse of discretion in the trial court concluding Reedy's testimony sufficiently authenticated the printouts of the emails.

### B.  Unfair Prejudice

{¶ 85} Next, Teitelbaum argues the trial court abused its discretion in admitting the emails into evidence because of the danger of unfair prejudice under Evid.R. 403(A).

{¶ 86} Evid.R. 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  There is no dispute here that the emails between Reedy and Teitelbaum constitute relevant evidence. However, Teitelbaum argues the emails are unfairly prejudicial.  Evid.R. 403(A) provides that "[a]lthough relevant, evidence is not admissible if its probative value is substantially

outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury."

{¶ 87} Teitelbaum seems to argue that because the emails tend to support a guilty verdict, they are therefore unfairly prejudicial. However, " '[i]f unfair prejudice simply meant prejudice, anything adverse to a litigant's case would be excludable under Rule 403. Emphasis must be placed on the word "unfair." ' " *State v. Crotts*, 104 Ohio St.3d 432, 2004-Ohio-6550, ¶ 24, quoting *Oberlin v. Akron Gen. Med. Ctr.*, 91 Ohio St.3d 169, 172 (2001). Thus, " '[u]nfair prejudice is that quality of evidence which might result in an improper basis for a jury decision.' " *Id.*, quoting *Oberlin* at 172. Evidence may be unfairly prejudicial if it " 'arouses the jury's emotional sympathies, evokes a sense of horror, or appeals to an instinct to punish.' " *Id.*, quoting *Oberlin* at 172. Often, though not always, evidence is unfairly prejudicial if it appeals to the jury's emotions rather than the jury's intellect. *Id.*

{¶ 88} Fairness is subjective and thus the determination whether evidence is unfairly prejudicial is left to the sound discretion of the trial court. *Crotts* at ¶ 25, citing *State v. Robb*, 88 Ohio St.3d 59, 68 (2000). We find no abuse of discretion in the trial court's conclusion that the contents of these emails do not appeal to the jury's emotions, evoke a sense of horror, or appeal to an instinct to punish. Instead, we agree with the state that the emails aided the jury in evaluating Reedy's credibility regarding his version of how the murder plot unfolded.

### C. Cumulative Evidence

{¶ 89} Teitelbaum also argues the emails were needlessly cumulative because Reedy was available to, and did in fact, testify. Evid.R. 403(B) provides that relevant evidence is not admissible if its probative value is substantially outweighed by consideration of undue delay or needless presentation of cumulative evidence. However, "Evid.R. 403(B) does not require exclusion of cumulative evidence. The court has discretion to admit or exclude it." *State v. Campbell*, 69 Ohio St.3d 38, 51 (1994). Cumulative evidence "is additional evidence of the same kind to the same point." *Smith v. Chatwood*, 2d Dist. No. 2618 (Aug. 15, 1990), citing *Kroger v. Ryan*, 83 Ohio St. 299 (1911), paragraph one of the syllabus.

{¶ 90} We do not agree with Teitelbaum that the emails were needlessly cumulative to Reedy's testimony. The emails served, along with Reedy's testimony, to establish a timeline of Teitelbaum's plot to kill Horn. Additionally, since Reedy admittedly testified pursuant to a joint agreement with the state and federal prosecutors, the emails served to help the jury assess his credibility. Thus, the emails were not needlessly cumulative and the trial court did not abuse its discretion in admitting the emails over Teitelbaum's objection.

### D. Contradictory Rulings

{¶ 91} Finally under this assignment of error, Teitelbaum argues the trial court's evidentiary rulings regarding the emails were contradictory. More specifically, Teitelbaum argues that because the trial court allowed Reedy to discuss the emails but did not allow Davis to testify regarding how she obtained the emails, the jury was not allowed to hear important information that would help it decide how much weight to place on the contents of the emails.

{¶ 92} When the state attempted to have Davis testify about the emails, Teitelbaum objected, and the trial court sustained his objection. Despite his successful objection at trial, Teitelbaum argues on appeal that the trial court should have permitted Davis to testify to a limited extent regarding how she accessed Teitelbaum's email account and copied the contents of certain emails into Word documents. Even if we were to somehow construe the trial court sustaining Teitelbaum's objection as error, it would be invited error. As we explained in our resolution of Teitelbaum's first and second assignments of error, the invited error doctrine precludes a defendant from making a strategic decision at trial and then complaining on appeal that the result of that decision constitutes reversible error. *Jennings* at ¶ 76, citing *Doss* at ¶ 7. *See also Murphy* at 535 ("a litigant may not 'take advantage of an error which he himself invited or induced' ").

{¶ 93} In sum, the trial court did not abuse its discretion in making its evidentiary rulings regarding the printouts of the emails between Reedy and Teitelbaum. Reedy's testimony provided a sufficient basis to authenticate the emails, the emails were neither unfairly prejudicial nor needlessly cumulative, and any error in the trial court not permitting Davis to testify regarding the emails was invited error. Accordingly, we overrule Teitelbaum's fourth assignment of error.

## VI.  Fifth Assignment of Error – Recording of Sidebar Conferences

{¶ 94} In his fifth assignment of error, Teitelbaum argues the trial court erred in failing to record all sidebar conferences as required by Crim.R. 22.  Teitelbaum argues the trial court's failure to record the sidebar conversation regarding the jury instructions aimed at whether the alternate jurors would be present for deliberations amounts to reversible error.

{¶ 95} Pursuant to Crim.R. 22, "all proceedings shall be recorded" for serious offenses.  However, the Supreme Court has "recognized that this foregoing requirement 'does not mean that the trial record must be perfect for purposes of appellate review.' " *State v. Ketterer*, 111 Ohio St.3d 70, 2006-Ohio-5283, ¶ 157, quoting *State v. Palmer*, 80 Ohio St.3d 543 (1997), syllabus.

{¶ 96} Here, the trial court granted a pretrial defense motion to record all sidebar conferences.  Though the trial court did not record the sidebar conference regarding the alternate jurors instruction, the trial court on the record reiterated what had been said, and Teitelbaum did not object to either the trial court's failure to record the sidebar or to the trial court's recitation of the sidebar conference.

{¶ 97} Teitelbaum did not exhaust App.R. 9 procedures to settle the record regarding any unrecorded sidebar.  *See Palmer* at 554 (no reversible error where defendant fails to show "an effort was made on appeal to comply with App.R. 9 and to reconstruct what occurred or to establish its importance").  Additionally, Teitelbaum does not attempt to reconstruct the sidebar conference beyond what the trial court did on the record, nor does Teitelbaum explain what, if any, prejudice occurred from the trial court's failure to record this sidebar conference.  The Supreme Court has "repeatedly refused to reverse convictions or sentences on the basis of unrecorded conferences when a defendant has not taken these steps."  *Ketterer* at ¶ 159, citing *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, ¶ 182-84.

{¶ 98} We overrule Teitelbaum's fifth assignment of error.

## VII.  Sixth Assignment of Error – Unanimous Jury Verdict

{¶ 99} In his sixth assignment of error, Teitelbaum argues the trial court erred in failing to properly instruct the jury regarding the alternate theories of aggravated murder. More specifically, the trial court instructed the jury it must find either (1) Teitelbaum

personally committed each act constituting aggravated murder, or (2) if Teitelbaum was not the principal offender, that he committed the aggravated murder with prior calculation and design.  Teitelbaum argues these two possibilities are mutually exclusive, so the trial court deprived him of his right to a unanimous verdict under Crim.R. 31(A) when it instructed the jury on both as separate aggravating circumstances.  Teitelbaum did not object to the jury instructions at trial and, thus, has waived all but plain error. *State v. Cook*, 65 Ohio St.3d 516, 527 (1992).

{¶ 100}  In *Cook*, as in the present case, the trial court instructed the jury that in order to find the specification, it must find either that the defendant committed aggravated robbery and was the principal offender or, if not the principal offender, committed the aggravated murder with prior calculation and design.  *Cook* at 527.  The Supreme Court noted "it is error for a trial court to allow the jury to consider prior calculation and design together with principal-offender status as separate aggravating circumstances" because "these circumstances are mutually exclusive alternatives."  *Id.* However, when prior calculation and design is charged disjunctively to principal offender status, using "or" instead of "and," then there is, in theory, no plain error in the instruction because the jury could not find both to be proven.  *Id.*

{¶ 101}  Here, although the trial court charged the two aggravating circumstances disjunctively, the jury nonetheless indicated on the verdict form that it found both principal offender and prior calculation and design.  Teitelbaum argues this violated his right to a unanimous verdict under Crim.R. 31(A).

{¶ 102}  "Although Crim.R. 31(A) requires juror unanimity on each element of the crime, jurors need not agree to a single way by which an element is satisfied."  *State v. Gardner*, 118 Ohio St.3d 420, 2008-Ohio-2787, ¶ 38, citing *Richardson v. United States*, 526 U.S. 813, 817 (1999).  In *Gardner*, the Supreme Court drew a distinction between multiple acts cases and alternative means cases.  "In an alternative means case, where a single offense may be committed in more than one way, there must be jury unanimity as to guilt for the single crime charged.  Unanimity is not required, however, as to the means by which the crime was committed so long as substantial evidence supports each alternative means." (Internal quotations omitted.)  *Gardner* at ¶ 49.  "In reviewing an

alternative means case, the court must determine whether a rational trier of fact could have found each means of committing the crime proved beyond a reasonable doubt." *Id.*

{¶ 103} Teitelbaum argues the state did not present any evidence that anyone other than Teitelbaum shot and killed Horn. Essentially, Teitelbaum argues that there was insufficient evidence for the jury to conclude that he was not the principal offender but that he did act with prior calculation or design. Even assuming arguendo that the evidence is insufficient to support a prior calculation and design specification in which he was not the principal offender, any error in the trial court instructing the jury on the prior calculation and design aggravating circumstance is harmless error because the jury also unanimously found that Teitelbaum *was* the principal offender. Stated another way, even without the prior calculation and design instruction, the jury still unanimously found Teitelbaum was the principal offender. Thus, any error in the jury instructions are harmless error, do not deprive Teitelbaum of his right to a unanimous verdict under Crim.R. 31(A), and do not rise to the level of plain error. We overrule Teitelbaum's sixth assignment of error.

## VIII. Seventh Assignment of Error – Ineffective Assistance of Counsel

{¶ 104} In his seventh assignment of error, Teitelbaum argues he was deprived of his constitutional right to the effective assistance of counsel. In order to prevail on a claim of ineffective assistance of counsel, Teitelbaum must satisfy a two-prong test. First, he must demonstrate that his counsel's performance was deficient. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). This first prong requires Teitelbaum to show that his counsel committed errors which were "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* If Teitelbaum can so demonstrate, he must then establish that he was prejudiced by the deficient performance. *Id.* To show prejudice, Teitelbaum must establish there is a reasonable probability that, but for his counsel's errors, the result of the trial would have been different. A "reasonable probability" is one sufficient to undermine confidence in the outcome of the trial. *Id.* at 694.

{¶ 105} In considering claims of ineffective assistance of counsel, courts indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, ¶ 101.

Teitelbaum contends his trial counsel was ineffective in (1) failing to file a motion to suppress the emails Davis obtained from Teitelbaum's email account; (2) failing to move for a preliminary determination of the admissibility of the emails pursuant to Evid.R. 104; (3) failing to file a motion to suppress the evidence obtained in the search of Teitelbaum's residence; (4) failing to object to the presence of the alternate jurors during deliberations; (5) failing to object to the jury instructions; (6) failing to object to the trial court's failure to record sidebar conferences; (7) failing to investigate and develop an argument regarding Horn's time of death; and (8) making inaccurate and prejudicial statements to the jury.

### A. Motion to Suppress Emails

{¶ 106}  Teitelbaum argues his trial counsel was ineffective in failing to file a motion to suppress the emails.  At trial, the state proffered that Davis would testify she obtained the emails by accessing Teitelbaum's email account without his knowledge using his password, copied the contents of the emails into another document, printed them in such a way to remove any identifying information that would link her to the emails, and anonymously mailed the copies of the emails to the Grove City Division of Police. Teitelbaum argues Davis's actions in acquiring the emails in this manner constitutes a violation of R.C. 2933.62(A) and/or Title I of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. 2510 et seq., and he argues his trial counsel should have moved to suppress the emails on these grounds.

{¶ 107}  "In order to prevail on a claim of ineffective assistance of counsel in a case involving a failure to make a motion on behalf of a defendant, the defendant must show '(1) that the motion * * * thereto was meritorious, and (2) that there was a reasonable probability that the verdict would have been different had the motion been made.' " *State v. Peterson*, 10th Dist. No. 07AP-303, 2008-Ohio-2838, ¶ 55, quoting *State v. Lawhorn*, 3d Dist. No. 11-04-19, 2005-Ohio-2776, ¶ 35.

{¶ 108}  Teitelbaum goes to great lengths to attempt to fit Davis's actions in accessing Teitelbaum's email account using his password into a violation of either R.C. 2933.62 or the ECPA.  However, even if we were somehow persuaded that a motion to suppress filed on this basis would have been successful, Teitelbaum cannot show any reasonable probability that the outcome of the trial would have been different.

{¶ 109} To the extent Teitelbaum suggests police would not have investigated him at all were it not for the receipt of the copies of the emails, the record undermines his argument. Detective Forney testified Teitelbaum was a suspect "[f]rom day one." (Tr. Vol. XV at 3066.) Police knew of the business dispute between Horn and Teitelbaum very early on in the investigation. Additionally, police collected a DNA sample from Teitelbaum over a week before the Grove City police received the printouts of the emails. Even without the emails, the focus of the investigation was already on Teitelbaum.

{¶ 110} Additionally, Teitelbaum does not explain how the outcome of the trial would have been different had the emails not been admitted. There was ample other evidence demonstrating Teitelbaum's motive to commit the crime as well as evidence placing him in the physical proximity of the location of the murder. Even without the email evidence, the jury had ample evidence to convict Teitelbaum. It is also possible trial counsel made the strategic choice not to file a motion to suppress but to instead object at trial in order to plant seeds of doubt regarding the strength of the state's case, especially since trial counsel's initial objection regarding the emails was successful. "Tactical or strategic trial decisions, even if ultimately unsuccessful, will not substantiate a claim of ineffective assistance of counsel." *State v. Ryan*, 10th Dist. No. 08AP-481, 2009-Ohio-3235, ¶ 77, citing *In re M.E.V.*, 10th Dist. No. 08AP-1097, 2009-Ohio-2408, ¶ 34.

**B. Preliminary Determination of the Admissibility of the Emails**

{¶ 111} Teitelbaum argues, without citation to any relevant authority, that the best approach to determine the admissibility of evidence is through the use of the procedures outlined in Evid.R. 104, which his trial counsel did not do here. However, as we noted above, trial counsel's decision to wait to object during trial may have been a strategic decision to highlight perceived weaknesses in the state's case for the jury. Additionally, because the trial court ultimately determined the emails were admissible, Teitelbaum does not demonstrate any prejudice from his counsel's failure to move for a preliminary determination of the admissibility of the evidence. Thus, trial counsel was not ineffective in this regard.

**C. Motion to Suppress Evidence Obtained from Teitelbaum's Residence**

{¶ 112} Teitelbaum next argues his trial counsel was ineffective in filing a motion in limine rather than a motion to suppress regarding the journal pages seized during the

search of his home.  The basis of Teitelbaum's motion in limine was an alleged Fourth Amendment violation, asserting officers seized items and materials beyond the scope of the search warrant.  Generally, "[a] motion to suppress, not a motion in limine, is the proper vehicle for raising challenges to exclude evidence which is the product of police conduct that results in a constitutional violation."  *State v. Montgomery*, 5th Dist. No. 2007 CA 95, 2008-Ohio-6077, ¶ 43, citing *State v. French*, 72 Ohio St.3d 446 (1995).  However, even if trial counsel utilized the wrong motion in an attempt to exclude the evidence, the trial court nonetheless considered the same issue and determined there was no Fourth Amendment violation, and we agree with that determination.  Thus, even if trial counsel had filed a motion to suppress, the trial court would have denied that motion and the outcome of the trial would not have been different.  *Montgomery* at ¶ 48 (stating "[c]ounsel can only be found ineffective for failing to file a motion to suppress if, based on the record, the motion would have been granted").  Accordingly, trial counsel's failure to file a motion to suppress the journal pages does not amount to ineffective assistance of counsel.

### D.  Alternate Jurors, Jury Instructions, and Sidebar Conferences

{¶ 113}  Teitelbaum's fourth, fifth, and sixth instances of alleged ineffective assistance of counsel relate to Teitelbaum's first, second, and fifth assignments of error on appeal.  Because Teitelbaum's trial counsel failed to object to these alleged errors, we reviewed Teitelbaum's first, second, and fifth assignments of error under a plain error standard, and, in disposing of those assignments of error, we concluded Teitelbaum was unable to demonstrate the outcome of his trial would have been different had it not been for these errors.  " '[W]here the failure to object does not constitute plain error, the issue cannot be reversed by claiming ineffective assistance of counsel.' "  *State v. Roy*, 10th Dist. No. 14AP-223, 2014-Ohio-4587, ¶ 20, quoting *State v. Carson*, 10th Dist. No. 05AP-13, 2006-Ohio-2440, ¶ 51.  *See also Murphy* at 540.

### E.  Argument Regarding Horn's Time of Death

{¶ 114}  Teitelbaum next argues his trial counsel was ineffective in failing to develop an argument regarding the time of Horn's death.  However, Teitelbaum does not elaborate as to what that argument could or should have been, nor does Teitelbaum explain what prejudice, if any, resulted from his counsel's failure to make such a vague

argument. Accordingly, we find trial counsel's choice not to pursue an argument regarding Horn's time of death does not amount to ineffective assistance of counsel.

### F. Inaccurate and Prejudicial Statements

{¶ 115} Finally under this assignment of error, Teitelbaum argues his trial counsel was ineffective in making various "inaccurate and prejudicial" statements to the jury during opening statement and closing argument. (Teitelbaum Brief at 60.) Teitelbaum identifies three statements he argues demonstrates his counsel's ineffectiveness: (1) during opening statement, his counsel stated "you're not going to hear a single witness come in here and say this is not the kind of person that loses his temper, that comes down here and threatens people"; (2) characterizing Horn's death as an "execution style" slaying; and (3) stating Horn was shot six times rather than five times. (Tr. Vol. VI at 1076-77, 1078.) Though Teitelbaum highlights these three statements he characterizes as inaccurate or prejudicial, he does not offer any explanation as to *how* these statements might have affected the outcome of the case. *See State v. Hughes*, 10th Dist. No. 14AP-360, 2015-Ohio-151, ¶ 58 (concluding defendant's failure to "point to anything in the closing argument that amounts to prejudice sufficient to satisfy the second prong of *Strickland*" precludes a finding of ineffective assistance of counsel). Thus, these allegedly inaccurate and prejudicial statements do not substantiate a claim of ineffective assistance of counsel.

{¶ 116} In sum, Teitelbaum is not able to demonstrate the requisite prejudice under the second prong of *Strickland* for any of his alleged instances of ineffective assistance of counsel. Accordingly, we overrule his seventh assignment of error.

## IX. Eighth Assignment of Error – Manifest Weight of the Evidence

{¶ 117} In his eighth assignment of error, Teitelbaum argues his convictions are against the manifest weight of the evidence.

{¶ 118} When presented with a manifest weight argument, an appellate court engages in a limited weighing of the evidence to determine whether sufficient competent, credible evidence supports the jury's verdict. *State v. Salinas*, 10th Dist. No. 09AP-1201, 2010-Ohio-4738, ¶ 32, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and

disagrees with the factfinder's resolution of the conflicting testimony." *Thompkins* at 387, quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). Determinations of credibility and weight of the testimony are primarily for the trier of fact. *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. Thus, the jury may take note of the inconsistencies and resolve them accordingly, "believ[ing] all, part, or none of a witness's testimony." *State v. Raver*, 10th Dist. No. 02AP-604, 2003-Ohio-958, ¶ 21, citing *State v. Antill*, 176 Ohio St. 61, 67 (1964).

{¶ 119} An appellate court considering a manifest weight challenge "may not merely substitute its view for that of the trier of fact, but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Harris*, 10th Dist. No. 13AP-770, 2014-Ohio-2501, ¶ 22, citing *Thompkins* at 387. Appellate courts should reverse a conviction as being against the manifest weight of the evidence in only the most " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 120} Teitelbaum's defense at trial was that he did not kill Horn and police had focused its investigation on the wrong person. The crux of Teitelbaum's manifest weight argument is an alleged lack of direct evidence that Teitelbaum was the perpetrator. However, "[l]ike any fact, the state can prove the identity of the accused by 'circumstantial or direct' evidence." *State v. Tate*, 140 Ohio St.3d 442, 2014-Ohio-3667, ¶ 15, quoting *State v. Jenks*, 61 Ohio St.3d 259, 273 (1991). " 'Circumstantial evidence is not less probative than direct evidence, and, in some instances, is even more reliable.' " *State v. Nicely*, 39 Ohio St.3d 147, 151 (1988), quoting *United States v. Andrino*, 501 F.2d 1373, 1378 (9th Cir.1974).

{¶ 121} Here, there was ample circumstantial evidence that Teitelbaum planned and carried out Horn's murder. Teitelbaum was in a contentious legal battle with Horn, and his journal entries showed a preoccupation with his hatred for Horn. The forensic evidence established Horn died from bullets fired from a 9 mm handgun, the same type of gun Reedy supplied to Teitelbaum. The GPS and cell-tower data showed Teitelbaum had

the opportunity to carry out the crime, traveling from his home in New Jersey all the way to Columbus, waiting at the end of Thrailkill Road that evening until a time corresponding with when Horn left the Platinum Players Club. DNA testing indicated that DNA found inside the doorknob of Horn's apartment was consistent with Teitelbaum, even though it was not as precise of a match as is sometimes possible with DNA testing. Additionally, surveillance footage showed Teitelbaum disposing of items into the water off the Main Street bridge late in the evening the night Horn was shot, buying a change of clothes at Walmart, and appearing to do something to the license plates on his car. The evidence showed Teitelbaum had grown a beard in the months leading up to Horn's death but shaved it off immediately afterward. And finally, the testimony that a border patrol agent caught Teitelbaum attempting to cross the border into Canada as law enforcement continued their investigation into him suggested Teitelbaum was trying to flee the country to avoid prosecution. From all of this evidence, a jury could reasonably conclude Teitelbaum was indeed the perpetrator.

{¶ 122} Teitelbaum argues there was evidence at trial suggesting Horn died in the early morning hours of March 11, 2011 rather than late at night on March 10, 2011 as the state theorized in its case. Specifically, Teitelbaum points to witness statements police gathered from two of Horn's neighbors who thought they heard noises between 11:00 p.m. and 2:00 a.m., a time frame in which the GPS data showed Teitelbaum had returned to Neace's residence. However, as we noted above, it is for the jury to consider conflicting evidence and resolve those conflicts. Given the ample other evidence tending to establish Teitelbaum's guilt, we cannot say the jury clearly lost its way in discounting the neighbors' recollections of what time they thought they may have heard a noise in favor of the overwhelming evidence pointing to Teitelbaum as the perpetrator. Thus, we do not find Teitelbaum's convictions are against the manifest weight of the evidence. We overrule Teitelbaum's eighth assignment of error.

## X. Ninth Assignment of Error – Cumulative Errors

{¶ 123} In his ninth and final assignment of error, Teitelbaum argues the cumulative effect of the alleged errors at his trial deprived him of his right to a fair trial and thus warrant reversal.

{¶ 124} Under the doctrine of cumulative error, "a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial court error does not individually constitute cause for reversal." *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 132, citing *State v. DeMarco*, 31 Ohio St.3d 191 (1987), paragraph two of the syllabus. However, where there are not multiple errors, the doctrine of cumulative error is not applicable. *Id.*

{¶ 125} Teitelbaum asserts the assignments of error raised in his brief are sufficient to implicate the doctrine of cumulative error. However, we have already determined none of those assignments of error have merit, and Teitelbaum is thus unable to point to even one error, let alone two or more cumulative errors, that would warrant reversal. *State v. Moore*, 10th Dist. No. 11AP-1116, 2013-Ohio-3365, ¶ 61 (noting that where a case "presents no errors to cumulate," the doctrine of cumulative errors does not apply). We, therefore, overrule Teitelbaum's ninth and final assignment of error.

## XI. The State's Cross-Appeal – Jury Instructions in Penalty Phase

{¶ 126} In its first and second cross-assignments of error, the state asserts the trial court erred and abused its discretion in instructing the jury during the penalty phase of the trial. By its first cross-assignment of error, the state argues the trial court erred in instructing the jury that the defendant bore no burden of proof. By its second cross-assignment of error, the state argues the trial court erred in instructing the jury that the aggravated murder itself was not an aggravating circumstance. We address each of these instructions in turn.

{¶ 127} As a preliminary matter, the parties dispute the appropriate standard of review. Teitelbaum argues an abuse of discretion standard is appropriate, while the state asserts the instruction was erroneous as a matter of law requiring de novo review. Ordinarily, the trial court has discretion to decide to give or refuse a particular instruction, and an appellate court will not disturb that decision absent an abuse of discretion. *Clark v. Grant Med. Ctr.*, 10th Dist. No. 14AP-833, 2015-Ohio-4958, ¶ 50. However, when a jury instruction contains an incorrect statement of the law, a reviewing court applies a mixed de novo and abuse of discretion standard of review. *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, ¶ 21, citing *Kokitka v. Ford Motor Co.*, 73 Ohio St.3d 89, 93 (1995). Thus, "[i]n examining errors in a jury instruction, a reviewing court

must consider the jury charge as a whole and 'must determine whether the jury charge probably misled the jury in a matter materially affecting the complaining party's substantial rights.' " *Kokitka* at 93, quoting *Becker v. Lake Cty. Mem. Hosp. W.*, 53 Ohio St.3d 202, 208 (1990).

### A. First Cross-Assignment of Error – No Burden Instruction

{¶ 128} In its first cross-assignment of error, the state argues the trial court committed reversible error when it instructed the jury during the penalty phase that Teitelbaum bore no burden of proof. The state argues that instruction contains an inaccurate statement of the applicable law.

{¶ 129} Pursuant to R.C. 2929.03(D)(1), in the penalty phase of a death penalty case, "[t]he defendant shall have the burden of going forward with the evidence of any factors in mitigation of the imposition of the sentence of death. The prosecution shall have the burden of proving, by proof beyond a reasonable doubt, that the aggravating circumstances the defendant was found guilty of committing are sufficient to outweigh the factors in mitigation of the imposition of the sentence of death." The parties do not dispute that the defense bears the burden of production of evidence of any mitigating factors, but they dispute whether the defense bears any burden of proof. Teitelbaum contends the instruction the trial court provided appropriately tracks the statutory language, but the state responds an analysis of the greater statutory scheme suggests a defendant does bear some burden of persuasion in proving mitigating factors.

{¶ 130} In *State v. Jenkins*, 15 Ohio St.3d 164 (1984), the Supreme Court considered an argument that Ohio's statutory scheme failed to explicitly identify whether a defendant bears the burden of proving mitigating factors in the penalty phase. In construing R.C. 2929.03 in the context of the greater statutory scheme, the Supreme Court stated:

> Although the standard is not readily apparent from a reading of R.C. 2929.03 or 2929.04, the Committee Comment to the former R.C. 2929.03 resolves any uncertainty. Therein, it is stated that "* * * [m]itigation must be established by a preponderance of the evidence and the rules of evidence also apply in this phase of the trial [except that] (the requirement for a pre-sentence investigation and report, the requirement for a psychiatric examination and report, and the provision for

> an unsworn statement by the defendant, represent partial exceptions to the rules of evidence.)"
>
> In the present case, the trial court placed the burden of proving mitigating factors by a preponderance of the evidence upon appellant. Thereafter, the state carried the burden of proving by proof beyond a reasonable doubt that the aggravating circumstances appellant was found guilty of committing outweighed the mitigating factors. Since the trial court correctly interpreted the standards governing the burden of proving mitigating factors and by what degree, we are unable to find merit in this assignment of error.

*Jenkins* at 171-72. Thus, based on *Jenkins*, the state argues it was error for the trial court to instruct the jury that Teitelbaum bore no burden of proof when it should have instructed the jury Teitelbaum needed to prove mitigating factors by a preponderance of the evidence.

{¶ 131} Subsequent to *Jenkins*, however, the Supreme Court decided *State v. Lawrence*, 44 Ohio St.3d 24 (1989). In *Lawrence*, the Supreme Court held that the aggravating circumstances of that case did not outweigh the mitigating factors beyond a reasonable doubt, rendering moot the appellant's argument that he was denied due process of law when the trial court instructed the jury that the appellant had the burden to prove the existence of mitigating factors by a preponderance of the evidence before the jury could weigh them against the aggravating circumstances. *Lawrence* at 27. Even though the Supreme Court determined the argument regarding the jury instruction was moot, the Supreme Court nonetheless stated:

> [W]e do believe that a jury instruction that closely tracks R.C. 2929.03(D)(1) and which does not place the burden of proving the existence of a mitigating factor by a preponderance of the evidence on the defendant would adequately guide a jury in its deliberations during a penalty phase of a capital trial. Further, such an instruction would ensure that Ohio jurors clearly understand that they are to consider all mitigating evidence in reaching their sentencing recommendation.
>
> Thus, we believe it would be the better practice for Ohio trial judges to follow the precise language of R.C. 2929.03(D)(1) for their penalty-phase jury instructions on this subject.

*Lawrence* at 27.   Teitelbaum asserts the Supreme Court has never overruled this language in *Lawrence*, and thus argues the trial court appropriately instructed the jury that Teitelbaum bore no burden of proof.

{¶ 132}  Though the state acknowledges this language from *Lawrence*, it notes that *Lawrence* did not operate to overrule *Jenkins* and that the Supreme Court has returned to the holding in *Jenkins* several times post-*Lawrence*.  *See, e.g., State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, ¶ 210-12 (noting *Jenkins* establishes the defendant has the burden of establishing mitigating factors by a preponderance of the evidence, but finding no plain error in the trial court instructing the jury that the defendant "does not have any burden of proof" because that instruction "provided the defense with more favorable instructions on mitigating evidence than required"); *State v. Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, ¶ 194-96 (concluding the "defendant does not have the burden of proof" instruction is a more favorable instruction for a defendant than *Jenkins* requires and thus no plain error); *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, ¶ 168 (citing *Jenkins* for the proposition that "[i]n the penalty phase, the defendant has the burden of proving, by a preponderance of the evidence, the existence of mitigating factors").

{¶ 133}  Having reviewed the relevant case law, we agree with the state that *Lawrence* did not operate to overrule *Jenkins*, and the two cases co-exist.  In *Jenkins*, there was an affirmative instruction that the defendant bore the burden of proving mitigating factors by a preponderance of the evidence, which the Supreme Court concluded was an accurate statement of the law.  *Lawrence* suggests an instruction that is silent on the defendant's burden is the best practice.  Here, unlike either *Jenkins* or *Lawrence*, the trial court affirmatively instructed the jury that the defendant bore no burden of proof.

{¶ 134}  We note the jury instruction the trial court provided emanated from the Ohio Jury Instructions.  *See State v. Ellis*, 10th Dist. No. 11AP-939, 2012-Ohio-3586, ¶ 12 (noting that, in determining whether a jury instruction is confusing or misleading, although "the Ohio Jury Instructions are not binding legal authority, it is significant that the trial court's instructions here are also consistent with the language from the Ohio Jury Instructions").  The state asks us to conclude that the trial court's instruction contained a misstatement of the law.  However, we need not determine whether the "no burden"

instruction was erroneous because, even assuming for purposes of argument that it was, there is no demonstration of the requisite prejudice in order for us to find reversible error.

{¶ 135}  As we noted above, when a jury instruction contains an error of law, we will not find reversible error unless the complaining party can demonstrate the instruction probably misled the jury in a manner affecting the complaining party's substantial rights.  *Kokitka* at 93.  The state argues the "no burden" instruction could have led the jury to mistakenly believe that the state bore the burden of disproving Teitelbaum's proposed mitigating factors.  *See State v. Seiber*, 56 Ohio St.3d 4, 16 ("[t]he state need not prove the absence of mitigating factors, but the state is required to prove beyond a reasonable doubt that aggravating circumstances outweigh mitigating factors"), citing *Jenkins* at 172.  However, this argument is mere speculation.  Moreover, in reviewing the entire charge to the jury during the penalty phase, we conclude the instruction that Teitelbaum bore no burden of proof probably did not mislead the jury.  In addition to instructing the jury that the state bore the burden of proving the aggravating circumstances outweighed the mitigating factors beyond a reasonable doubt, the trial court also instructed the jurors that they are "the sole judges of the facts, credibility of the witnesses, and the weight of the evidence.  To weigh the evidence you must consider the credibility of the witnesses including the defendant."  (Tr. Vol. XVIII at 3712.)  Thus, the trial court appropriately instructed the jury that it still needed to weigh the evidence before it, obviating the state's concern that the jury would assume it needed to blindly accept any proffered mitigation evidence from Teitelbaum in the presence of the "no burden" instruction.

{¶ 136}  Further, the crux of the trial court's instructions during the penalty phase emphasized that in order to impose the death penalty, it was the state, and not the defendant, who must convince the jury beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating factors.  Reviewing the jury instructions as a whole, we conclude the instructions adequately conveyed the jury's responsibility in this regard.  The "no burden" instruction, when read in context, serves to emphasize that the state's burden to prove the appropriateness of the imposition of the death penalty.  It does not, as the state asserts, probably mislead the jury in a manner affecting the state's substantial rights.  Accordingly, we overrule the state's first cross-assignment of error.

## B.  Second Cross-Assignment of Error – Aggravating Circumstance Instruction

{¶ 137}  In its second cross-assignment of error, the state argues the trial court erred when it instructed the jury during the penalty phase that the aggravated murder itself was not an aggravating circumstance.  Similar to its first cross-assignment of error, the state again argues this jury instruction contained an inaccurate statement of the law.

{¶ 138}  Like the "no burden" instruction discussed in the state's first cross-assignment of error, this aggravating circumstance instruction also comes from the Ohio Jury Instructions.  Though an instruction's inclusion in the Ohio Jury Instructions is not dispositive of its accuracy, here, the Supreme Court of Ohio has approved the identical language.

{¶ 139}  In *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, the Supreme Court considered jury instructions in the penalty phase of a capital case related to aggravating circumstances.  As relevant here, the Supreme Court in *Lang* stated:

> The trial court properly instructed the jury on the aggravating circumstances that they could consider their deliberations. The trial court's instructions included the admonition, "The aggravated murder itself is not an aggravating circumstance. You may only consider the aggravating circumstances that were just described to you and which accompanied the aggravated murder."  It is presumed the jury followed the trial court's instructions.

*Lang* at ¶ 292.  This instruction is identical to the one the trial court provided here. Though the state argues the various perceived merits of allowing the jury to consider the aggravated murder itself as one of the aggravating circumstances, the state does not acknowledge *Lang*.  Thus, we agree with Teitelbaum that the aggravating circumstance instruction was a correct statement of the law.  To the extent the state argues the instruction was nonetheless misleading or confusing, we reject that argument.  *Ellis* at ¶ 12 (concluding "[i]nsofar as appellant argues that these instructions were confusing and misleading on their face, we decline to find so when the Supreme Court of Ohio and Ohio Jury Instructions have endorsed the same language").

{¶ 140}  Thus, because the aggravating circumstances instruction contained a correct statement of the law and did not confuse or mislead the jury, the trial court did not

abuse its discretion in providing this instruction to the jury during the penalty phase.  We overrule the state's second and final cross-assignment of error.

## XII.  Disposition

{¶ 141} Based on the foregoing reasons, the trial court did not plainly err in allowing the alternate jurors to be present for a portion of deliberations, and the trial court effectively cured any error before the jury reached a verdict by removing the alternates and instructing the jury to begin its deliberations anew.  Moreover, the trial court did not abuse its discretion in its evidentiary rulings, the trial court did not commit reversible error in failing to record all sidebar conferences, Teitelbaum's conviction did not deprive him of his right to a unanimous jury verdict, Teitelbaum did not receive the ineffective assistance of counsel, the manifest weight of the evidence supports Teitelbaum's convictions, and the doctrine of cumulative errors does not apply to warrant reversal.  Additionally, the trial court did not abuse its discretion in instructing the jury during the penalty phase.  Having overruled Teitelbaum's nine assignments of error and having overruled the state's two cross-assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

DORRIAN, P.J., and BROWN, J., concur.

———————————